ABRAHAM TOPKIS, Surviving Executor of the Estate of Louis Topkis, Deceased,

*vs.*

DELAWARE HARDWARE COMPANY, a corporation of the State of Delaware, HARRY TOPKIS and ISAAC B. FINKELSTEIN.

*New Castle, Aug. 16, 1938.*

126

*Aaron Finger,* of Richards, Layton & Finger, for complainant.

*Hugh M. Morris* and *Edwin D. Steel, Jr.,* for defendants.

THE CHANCELLOR: The defendant, Delaware Hardware Company, will be referred to herein as the Company. It is a corporation of this State. Before the individual defendants became interested in it, it was controlled by one David Roth. In October of 1922 the individual defendants contemplated the acquisition of all the stock of the Company from Roth. The only stock then outstanding was common stock. Later in 1924 the preferred stock which is now sought to be cancelled was authorized by an amendment to the Company's certificate of incorporation and was issued

to the individual defendants. Arrangements were made for the purchase of Roth's stock by Louis Topkis, the complainant's father and testate, who was the brother of the defendant, Harry Topkis. The price was one hundred and sixty-five thousand dollars, payable by cash of ninety thousand dollars, balance of seventy-five thousand dollars in promissory notes. The purchase was consummated on January 1, 1923. Louis Topkis provided the cash of ninety thousand dollars. Notes for the balance, the bill charges, were given either by the individual defendants or by the Company, or by both, the complainant does not know which. All the stock theretofore owned by Roth, which was the entire outstanding issue, was transferred to the individual defendants. The bill alleges that the individual defendants had neither funds nor credit to pay for the stock when it was purchased. It charges that they eventually paid for it out of dividends declared on the preferred stock which was subsequently created and issued to them or out of loans they obtained from the Company which, to the extent they were repaid, were repaid from such dividends. The bill charges that the preferred stock was void in its issuance and so should be cancelled, and that as dividends received on the allegedly void preferred shares went to pay for the stock purchased from Roth, all that stock (or rather its present equivalent, viz., present common stock held in its stead since the amendment of 1924) should be impressed with a trust in favor of the Company.

From the bill it appears that the purpose of Louis Topkis was to establish his brother and the defendant Finkelstein in the business which the company was engaged in conducting. They were without means themselves to purchase it. He financed it for them. After the purchase and the installation of the individual defendants in the operation and management of the company, Louis Topkis continued for a considerable time to supervise its conduct and direct its policies. For a number of years thereafter,

through his own resources and upon his own credit, he obtained loans in substantial amounts to enable the Company to carry on its business.

On May 16, 1924, the Company amended its certificate of incorporation. The amendment altered the capital structure of the Company. Prior thereto, as before stated, the only authorized stock was a common stock. How many shares there were and the par value thereof are not stated. The amendment to the charter made the authorized capital of the Company to consist of two thousand shares of six per cent cumulative preferred stock (par one hundred dollars) and two thousand shares of common stock without nominal or par value. The common stock was given the sole voting power. After describing the two classes of stock, the amendment proceeded as follows:

> "The present outstanding stock of the corporation shall be exchanged for the new preferred and no par value common stock, hereby authorized, within such time and under such conditions as may be designated by its Board of Directors upon the following basis.

> "For one share of the present outstanding stock of the corporation, there shall be issued in exchange one share of the preferred stock and one share of the no par value common stock authorized by this amendment."

After the amendment was adopted, the individual defendants became the owners by exchange of all the shares of the common stock and all the shares of the preferred stock that were issued under the authority of the amendment. Whether the exchange required the issuance of all or only a part of the authorized shares, does not appear from the bill.

On June 5, 1926, Louis Topkis acquired twenty shares of the common stock. The bill does not say so, but presumably the fact is that he acquired these shares from the individual defendants. After June 5, 1926, except for these twenty shares of common stock held by Louis Topkis, each of the two individual defendants held an equal number of shares of the entire issue of both classes of stock outstand-

ing. Thus Louis Topkis held the balance of voting power as between the individual defendants.

The bill alleges that "as appears from the face of said certificate of amendment, the legal effect of said amendment was merely to change the previously existing par value common stock of the corporate defendant into no par value common stock, and to give, without any consideration whatsoever, shares of the newly created hundred dollar par value preferred stock to the holders of the common stock on the basis of share for share."

This allegation expresses the thought that underlies the complainant's contention that the preferred stock (because of said alleged lack of consideration therefor) was unlawfully issued, and that therefore it should be cancelled, and the common stock, given in exchange for the old common stock for which the individual defendants were later enabled to pay by the dividends received by them on the allegedly void preferred stock, should be impressed with a trust in favor of the Company, on the theory that the moneys which were rightfully the Company's but which went to the individuals in the form of dividends on illegal preferred stock were the moneys that really bought the common stock.

If this contention be sustained a result obviously very interesting to the complainant would ensue. That result would be that the complainant as the holder of only twenty shares of common stock would own the company and the individual defendants would be deprived of all interest therein. The purpose which the complainant's testate had to establish the individual defendants in the business as the owners thereof would be frustrated. If his financing of the venture for them, both in the original acquisition of the Company and in its subsequent operation, and his oversight over its management and his supervision of its policies, may be called a gift, as in one sense it quite properly

may be called, the result after a lapse of over thirteen years, if the complainant's contention is accepted, would prove to be that his executor had suddenly turned ,his gift into an "Indian gift" which the individual defendants had done well, when it was offered, to reject.

Now it does not seem likely that when Louis Topkis acquired the twenty shares of common stock two years after the preferred stock was created and acquired by his business proteges, the individual defendants, he could have been ignorant of the details of exactly what had been done. The allegations of the bill concerning the supervision of Louis Topkis over the business and the direction by him of its policies for a considerable time after its acquisition, are calculated to show that he was fully advised of and acquiesced in the very thing his executor now complains against. If so, he acquired his twenty shares after the event, with full knowledge of all the facts which the complainant as his successor in title now objects to. If Louis Topkis were living and were the complainant in this bill and were admitted to have acquiesced in what the amendment of 1924 accomplished, he would not be heard after all these years to ask a court of equity to take from the individual defendants what he had freely bestowed and to undo transactions which, if he did not suggest, he was aware of and acquiesced in. *Finch v. Warrior Cement Corp.,* 16 *Del. Ch.* 44, 141 *A.* 54; *Trounstine v. Remington-Rand, Inc.,* 22 *Del. Ch.* 122, 194 *A.* 95. His executor's rights rise no higher than his.

It is quite true that knowledge and acquiescence on the part of Louis Topkis are shown by the bill only by inference, though strong inference, rather than by direct allegation. Accordingly, it may be said that the court should not take knowledge and acquiescence on his part into account on a demurrer to the bill.

But even if there was no such thing as knowledge and

acquiescence on the part of Louis Topkis estopping the complainant from objecting to the issuance of the preferred stock, yet I am of the opinion that the complainant's bill is not otherwise maintainable, for no legal fault is to be discovered in its issuance. The bill asserts that from the face of the amendment its legal effect was merely to change the existing par value common stock into no par value common stock, and to give, without any consideration whatsoever, shares of the newly created hundred dollar par value preferred stock to the holders of the old common on a share for share basis. I do not think that the amendment on its face can be said to disclose that to have been its legal effect. In the first place what is there on the face of the amendment which shows that in the exchange the stock turned in was in consideration solely for the no par common stock and that the preferred stock was a pure gift? Why, so far as the face of the amendment discloses, may it not be said with equal force that the reverse was true, viz., that the stock turned in for exchange paid for the preferred and that the common was given as a bonus?

Furthermore, as the alleged illegality of the issuance of the preferred stock is charged to have consisted in its issuance without consideration, we are concerned with the question of quality and quantum of consideration as the fundamental one. Now the amendment shows nothing on its face which relates to the value of the consideration which was received by the corporation for the preferred and common stocks which it authorized. As to the quality of the consideration, I take it that no legal objection can be made to a transaction to which every existing stockholder assents in which new stocks are created by a corporation and given in exchange for all its theretofore outstanding stock. In such a situation the constitutional and statutory exactions as to quality of consideration are not offended against. The only question then remaining would concern itself with the quantity of consideration; and as to that no

objection could be justly made, provided the values underlying the old stock (which values of course the corporation has in its possession) are at least equal to the total of the capital value of the par value stock and the declared value of the no par value stock which are issued in exchange or in substitution for the old stock. In that event, the shares then outstanding have a dollar for dollar capital value underlying them as their supporting consideration. In such case the legal requirements both as to quality and quantum of consideration would be satisfied.

Now the amendment on its face shows nothing whatever with respect to the asset values that underlay the old stock. The bill is silent upon the Company's asset condition. *Non constat*, the assets may have had a net worth far in excess of the capital liability represented by the preferred and new common shares that were issued in substitution. How then can it be affirmed from what appears on the face of the amendment that the preferred stock was issued without consideration—was given away?

So far, then, as the bill shows, the shares which the individual defendants received in substitution for their old shares, were supported by full consideration. The predicate, therefore, upon which the complainant's argument is based, viz., that the issuance of the preferred stock was without consideration, is not shown to exist. That being so, the bill does not disclose a case calling for its cancellation.

It follows also that it cannot be said that the preferred dividends which the individual defendants received and which they used to pay for the old stock originally purchased, were dividends unlawfully taken from the Company. That being so, there is no ground on which to rest the complainant's contention that the moneys in the form of dividends which paid for the common stock along with the preferred (that is to say for the old stock, which was the predecessor, so to speak, of the present preferred and

common) were in truth the Company's moneys and that the common stock should therefore be treated as impressed with a trust in the Company's favor, on the following-of-assets doctrine.

I suppose when the no par common stock which the amendment of 1924 authorized was issued, it was issued at a stated value as contemplated by the act. Suppose it was issued at the value of one dollar per share, a supposition which the bill does not negative, and value in at least that amount was paid for it. Suppose at the same time the preferred stock of one hundred dollars par value was issued to the lawful holders of the common under circumstances that would warrant its cancellation—would it be equitable after the lapse of thirteen years, in addition to cancelling the preferred stock in the hands of the individual defendants, to treat the dividends they had received thereon as something which should be taken from them and given over to the Company, and also take from them the common stock? To do so, under the supposition I have just made would be so grossly unfair as to be shocking. Why? Because certainly the no par common stock issued at one dollar on a share for share basis for old common stock (there being no showing of a capital deficit), would be stock at least fully if not more than paid for, and so would be lawfully outstanding; and if the preferred were considered as void and so not entitled to dividends then the lawfully issued common would have been entitled to the dividends which the supposedly unlawful preferred stock had received. The individual defendants as owners of the lawful no par common would have been entitled to those dividends. Yet the complainant would take from the individual defendants the benefit of the dividends which, on the complainant's theory, they had received on unlawful preferred stock, but which on the same theory that the preferred stock was unlawful, they were entitled to declare to themselves as holders of lawful no par common.

The case, in so far as the bill's allegations show, is consistent with the possibility of such an inequitable situation as that.

The point need not be labored any farther. The bill does not show a case calling for cancellation of the preferred stock and for the impressment of a trust in the Company's favor upon the no par common.

On January 26, 1936, another amendment to the certificate of incorporation was adopted. The bill asks that that amendment be declared void as in fraud of the complainant's rights as the holder of twenty shares of the no par common stock. No complaint is made against the procedure by which the amendment was adopted.

The amendment of 1936 provided in effect that the voting power which theretofore had been vested exclusively in the no par common stock should thereafter be vested exclusively in the preferred stock. Some difficulties had arisen between the complainant and the two individual defendants which, according to the bill, prompted the corporation, under the dominance and control of the individual defendants, to transfer the voting rights from the no par common to the preferred stock. As the situation existed before the amendment of 1936, if the two individual defendants, holding as they do each an equal number of preferred and common shares, should get into an irreconcilable difference upon questions of policy and management, the complainant as the owner of twenty shares of common stock would be in the highly advantageous position of holding the balance of power, with all the bargaining potentialities which any one in such a position has. Now while the individual defendants were content to entrust the power of arbiter between them in case of differences to Louis Topkis, they evidently were not satisfied to entrust the complainant with that power. They preferred to trust to their ability to reconcile differences between themselves, rather than incur the

risk of having the complainant, in case irreconcilable differences arose between them, vested with the power of decision. It may have been also that they did not choose to leave open the possibility which naturally would always exist of the complainant's encouraging conflict between them with the view of playing one against the other and trading upon the situation thus created.

An amendment which changes the voting power of the stock of a corporation and which has no purpose further than that is not conceived in fraud. *Maddock v. Vorclone Corp.*, 17 *Del. Ch.* 39, 147 *A.* 255; *Morris v. American Public Utilities Co.*, 14 *Del. Ch.* 136, 155, 122 *A.* 696, 705. The complainant cites *Allied Chemical & Dye Corp., et al., v. Steel & Tube Co.*, 14 *Del. Ch.* 1, 120 *A.* 486, and *Bodell v. General Gas & Electric Corp.*, 15 *Del. Ch.* 119, 132 *A.* 442. Those cases hold that a power conferred by the statute upon a majority of the stockholders or upon the directors, though conferred in terms that are absolute, is nevertheless subject to restraint by a court of equity if it be inequitably exercised. The question in such cases is whether the supposed advantage which the exercise of the power is said to intend to secure, is one that a court of equity would pronounce to be unfair to others who are affected thereby. Where as here the exercise of the power is one that is designed to change voting rights as allowed by the statute and the change is not aimed to accomplish an ulterior purpose beyond itself that can be denominated as inequitable, no ground exists for interference. The injury which the complainant says in his bill the amendment of 1936 did to him consists in this, that before the amendment his twenty shares constituted the balance of power in the corporation, that this balance of power gave a particular monetary value to the complainant's shares which the amendment has taken from him. What does that mean? It means, if anything, that the complainant considers it to be a legitimate element of value to his shares, that in case of differences between

the two individual defendants he will be able to traffic to his immense advantage upon their troubles. I cannot conceive it to be a fraud on him for the individual defendants to adopt measures to protect themselves against that possibility.

The defendants have demurred to the bill on the further ground that it is multifarious. I am of the opinion that this objection is not well taken.

The demurrer should be sustained upon the other grounds, heretofore discussed.

Order accordingly.