At issue in these cross appeals is division of the proceeds from sale of the corporate assets of a dissolved private club. The trial court allocated 65% of the proceeds to the so-called active members and 35% to the inactive members. Both groups appealed. The inactive members (also referred to herein as defendants or appellees) seek a pro rata distribution of the proceeds; the active members (plaintiffs-appellants) claim *Page 1361 
that the trial court should have distributed the proceeds to them alone. In addition, the case of one club member, Mrs. Rosemary Bender, has been treated separately throughout the proceedings and is discussed separately below. We affirm in part, reverse in part, and remand.
 FACTS
These proceedings began in August 1980 when the Gulf Fishing and Boating Club, Inc. (Club), filed a petition in Mobile Circuit Court (1) to invoke the trial court's authority to supervise and approve the Club's voluntary dissolution under the applicable provision, Code of 1975, § 10-3-165 (3), of the Alabama Non-Profit Corporation Act and (2) seeking a declaratory judgment regarding the validity of the inactive members' claim to share in the distribution of the corporate assets, the Club's position being that only the active members were entitled to make that claim. The first aspect of the petition was uncontested and dissolution proceedings took place. After further hearings the trial court on May 21, 1982, issued a decree which provides in part as follows:
"This cause coming before the Court on the aspect of this case which calls on the Court to determine what persons shall be entitled to share in the net assets of the Club upon its final dissolution, it being shown to the Court that earlier in the proceedings in this cause the Club has taken proper and appropriate steps toward final dissolution, which were approved by this Court by Order entered on January 26, 1981, and that the last remaining properties of the Club, consisting of a substantial and valuable tract of land located on Dog River in Mobile County, Alabama, has been sold with the approval of this court, and the sale confirmed by this Court on November 17, 1981 for a sale price of One Million One Hundred Thousand Dollars, and that all that now remains to be done before the final dissolution of the Club is to determine those persons who will be entitled to share in the net proceeds received from the sale of the assets of the Club and any other funds which are the property of the Club upon its dissolution.
"It quickly evolved and became apparent to the Court upon the opening of this hearing that the contest as to what parties shall be entitled to share in the assets of the Club upon dissolution is between those parties, forty-five (45) in number, who were active dues paying members of the Club at the time the final decision to dissolve the corporation was approved, all of whom individually had purchased and held a `Certificate of Membership' in the Club, (which certificate the Court will hereinafter discuss) which group for convenience the Court will designate as the Plaintiffs; and those parties who were not active dues paying members of the Club at the date of the final decision to dissolve the corporation, but who had purchased and paid for a `Certificate of Membership' in the Club, but had retired from active membership at some date prior to the date on which the action to dissolve was taken. This group numbers sixty-four (64) persons whom the Court shall call the Defendants. A number of this group appeared by counsel, some appeared pro se, and some twenty-six (26) made no appearance at all.
"There is a third category, consisting of one individual, namely Mrs. Rose Mary [sic] Bender, the widow of Tom Bender, whose husband paid membership dues faithfully until the time of his death, and after his death Mrs. Bender continued to pay his dues under a widow's membership privilege in the Club up to and through the date of the decision to dissolve the Club, but her husband was not required, under a special agreement with the Club, to purchase a `Certificate of Membership', even though this was a strict membership requirement which was complied with by all other members of the Club in both the above categories.
"Evidence was offered at this hearing by all of the above categories, both by oral testimony in open Court, and by exhibits and documents submitted into evidence, among which was a `Certificate of Membership', as well as written and oral *Page 1362 
stipulations offered from time to time during the hearing.
"The Court, having heard, reviewed, and considered all of the legal evidence presented at the hearing, now makes the following Findings of Fact, conclusions of law, and judgment on the case:
"1. The Court finds that the Gulf Fishing and Boating Club is a long standing, social and recreational Club, having been established either before or shortly after the turn of this century, and that it acquired and continued to own a large tract of land on the North side of Dog River which runs through Mobile County into Mobile Bay. Around the year 1960, the Club was in financial difficulties and being, in the opinion of the Members of the Club, in urgent need of repairs and improvements to the Club House, and a fresh water swimming pool on the premises for the enjoyment of the members and their children. No funds were available for these necessities, so the Club decided, as a means of raising the necessary funds to finance these improvements, to issue and sell to members of the Club, and to make it a requirement of membership for future members, a `Certificate of Membership', for a price of $250.00 each, this price being payable either on time, or in cash, but in all events to be paid in full before the Certificate would be issued to the purchaser. A total of one hundred nine (109) Certificates were issued and sold, representing the classes of holders referred to above. Each Certificate carried a provision that it was issued subject to the Constitution and By-Laws of the Club and any changes which might later be made therein. That provision is worded as follows:
"`This Certificate is purchased and held subject to all the terms, conditions and limitations contained in the charter, constitution and by-laws of the Gulf Fishing and Boating Club, Inc. Any changes, additions or amendments of said charter, constitution and by-laws hereafter made shall become and be a part of this Certificate of Membership and shall be binding on the holder of this certificate.'
"The Certificate also contains a specific provision that `In the event of dissolution of the Gulf Fishing and Boating Club, Inc., the assets of the corporation, after payment of all obligations shall be distributed among the members of the corporation holding Certificates of Membership on a pro rata basis.' If therefore, in the final analysis, there is at the time of the dissolution of the Club, a conflict between these two quoted provisions of the Certificates, the Court must determine which provision shall prevail.
"At the time the Certificates of Membership were initiated, which from the evidence was around the year 1960, the By-Laws of the Club provided that upon dissolution of the Club, the net assets would be `equally divided among the active members of the Club in good standing at the time of dissolution' which class was defined as active dues paying members. However, around the year 1971, the Club, which continued to have financial difficulties, entered into an agreement with the Elks Lodge in Mobile under which the Elks would operate and be in charge of the Club premises, and members of the Gulf Fishing and Boating Club would have to become members of the Elks in order to continue to have the use and enjoyment of the Club facilities. Thus the Club became practically inactive at that time, and the dues were reduced to the amount of $10.00 per year, and about the only activity of the Club for its members was the annual membership meeting. In 1973 the By-Laws as to membership were amended to provide for two categories of membership, one being `ACTIVE MEMBERS,' this group being defined as those members who hold Certificates of Membership and are paying dues. The other category of members was `INACTIVE MEMBERS,' which group was defined as those members holding Certificates of Membership but not paying dues. This classification gave membership status in good standing to all holders of Certificates, even though they were not paying dues. Then, in March of 1980 the Active Members of the Club amended the By-Laws by deleting *Page 1363 
completely the category `INACTIVE MEMBERS,' and restricting membership only to those members holding Certificates who were currently paying dues. If this amendment to the By-Laws was permitted, it would have the effect of eliminating the membership status of the Inactive Members so that they could not qualify under the provision of the Certificate of Membership referred to above which provides that in the event of dissolution the assets of the corporation shall be distributed among the `Members of the Corporation' holding Certificates of Membership on a pro rata basis. It is the contention of the defendants [i.e. appellees, 26 of whom made no appearance and 38 of whom are participating in this action] that this 1980 amendment of the By-Laws by the Active Members [i.e. appellants, 45 in number] who are the plaintiffs in this cause, was made with the deliberate intention of trying to deprive the Defendants of their vested right which they claim to possess as holders of Certificates of Membership to share in the assets of the corporation upon dissolution, and they contend that it amounted to a deprivation of their property rights without due process.
"In addition to the specific terms of the Certificate of Membership itself, the Court also heard evidence from numerous Certificate holders covering the circumstances surrounding their purchase of their Certificates, and representations made to them by the Club, or representatives of the Club, at the time they purchased their Certificates. The Court is convinced from the preponderance of the evidence that the holders of Certificates were given the impression by the Club that they were purchasing an ownership interest in the assets of the Club and that they would be entitled to share in those assets in the event the Club should ever be dissolved. In fact, there were several members who testified that they were purchasing their respective Certificates on a time payment plan, and when they decided to retire from active membership in the Club, they had not completed payment for their Certificates, and each of them testified that he completed the payment for his Certificate at the time he resigned from active membership in order to preserve his property rights under the Certificate, and each testified that the Club delivered his Certificate to him after he had in fact resigned from active membership. This action by the Club clearly indicated that the Club itself recognized the validity of the Certificate and the rights of a holder thereunder after the holder had become inactive in the Club.
"The Court takes note of the fact that, while there is ample evidence to show that Certificate holders generally were informed of their property rights in the Club by virtue of their purchase of the Certificate, there was no evidence offered that the Club also pointed out to purchasers of Certificates at the time of purchase that these property rights would be subject to any limiting provisions of the Constitution and/or By-Laws of the corporation or any amendments thereto. Some Certificate holders who were witnesses in the hearing, on examination testified that they knew or assumed that the Club had official By-Laws, but that they had never seen them, though they felt assured that they had a right to and would be permitted to see them if they had requested to do so.
"After the decision was made by the active members of the Club to dissolve the Corporation, the Club then decided to reimburse all holders of Certificates who were not then active dues paying members the initial cost of their respective Certificates, being the sum of $250.00, and request the surrender of the Certificate; and to this end, attempt was made by the Club to locate all Certificate holders in this category and the offer was made to them, informing them at the same time of the planned dissolution of the Club. Some of these Certificate holders accepted this offer and surrendered their Certificates, others declined. It is not known to the Court how many are in each of these categories; however, all those Defendants appearing through counsel, as well as counsel for the plaintiffs, have agreed that in the event the Court should rule that any of the Defendants be entitled to a share in the Club assets on *Page 1364 
dissolution, all Defendants, regardless of their individual status, and possible differences in the merits of their individual claims, should share equally with all other Defendants."
"Having made the foregoing findings of fact from all of the evidence adduced at the hearing, the Court now proceeds to make findings of the law in the case as follows:
"1. The provision in the Corporation's By-Laws which were in effect when the Certificates of Membership were initiated, which provided that only active members of the Club in good standing were entitled to share in the distribution of the assets of the Club upon dissolution, were inoperative and invalid as to those members of the Club who had purchased Certificates of Membership while that provision of the By-Laws was in effect but who had retired from active membership before the amendment of the By-Laws in 1973 which established a class of `Inactive Members', for the reason that these holders of Certificates had purchased their Certificates under the impression and understanding given to them by the club that their ownership of the Certificate would entitle them to share in the assets of the Club upon its dissolution, without any mention or notice of the limiting factor in the By-Laws of the corporation in effect at that time which would strip them of this right upon their becoming inactive. The Court holds that the Club owed these Certificate holders the duty of notifying them that they stood to lose their property rights under this provision of the By-Laws if they became inactive, in order that they might protect and preserve their property rights, and by failing to give this notice the Corporation has forfeited any right to deprive these Certificate holders of their property rights under the expressed provision of the Certificate, and as represented to them upon their purchase thereof.
"2. The Court further finds that the amendment to the By-Laws in 1973 which established a new class of members called `INACTIVE MEMBERS', which was defined in the amended By-Laws as those members holding Certificates of Membership but not paying dues, operated for the benefit of and included not only members of the Club who would resign from active membership after the enactment of this amendment, but also all of those Certificate holders who had resigned from active membership prior to the amendment establishing this inactive class of members, there being no difference between those who resigned prior to the amendment and those who resigned after the amendment insofar as their rights under the Certificate of Membership is concerned.
"3. The action of the active members of the corporation in attempting to amend the By-Laws in March of 1980 to completely eliminate the class of `Inactive Members' was invalid and ineffective as to the rights of that class to share in the assets of the corporation upon dissolution under the provisions of their Certificates of Membership. The Court holds that this provision of the Certificate was a contract right which could not be divested by the unilateral action of the active members which action could clearly have no other purpose than to enrich themselves at the expense of the inactive members. Here again, the Court notes its observation in the findings of fact above that no notice was ever given to the Certificate holders of any provisions in the By-Laws which would limit, or even cut off, their property rights under their Certificate, whereas this property right was strongly presented to them in urging their purchase of the Certificate. Furthermore, the provision of the Certificate giving the holder the right to share in the assets of the Club upon dissolution, was explicit and without restriction, whereas the provision of the Certificate making it subject to the Constitution and By-Laws of the corporation and any amendments thereto was general in nature such as to require the corporation to inform holders of Certificates of any provision or amendment in the Constitution or By-Laws which would adversely affect this property right. This was not done. In these circumstances, therefore, the Court holds that the specific provision of the Certificate of Membership which gave to the holder the right to share in the *Page 1365 
assets of the Corporation upon dissolution override any provision in the Constitution or By-Laws of the corporation, or amendments thereto, which would limit, restrict, or eliminate this property right.
"4. It is the opinion of the Court, that with respect to the membership status of Mrs. Rose Mary Bender, the agreement between her late husband, Tom Bender, and the officials of the corporation granting him membership status without the necessity of purchasing a Certificate of Membership was invalid, for that there was no authority under the By-Laws covering requirements for membership which were in force at the time of the agreement, that would authorize this arrangement. However, since the late Mr. Bender did continue to pay his Club dues in reliance on this agreement throughout his life, and after his death his widow continued the payment of the said dues in similar reliance until the decision was made to dissolve the Club, equity would indicate that active membership status should be accorded to Mrs. Bender, and the Court so rules.
"5. However, the Court is cognizant of the equities involved in this proceeding, and is impressed with the fact that the Plaintiffs continued to stay with the Club and hold it together during the trying years from 1971 to the date of dissolution, even though the Club was practically inactive during that time, and in the opinion of the Court, equity requires that the Plaintiffs should receive a proportionately larger share as a class than the Defendants. It is the opinion of the Court and the Court so rules that the Plaintiffs, as a class, shall be entitled to and receive sixty-five (65%) percent of the total net assets of the Club upon final dissolution, and the Defendants, as a class, shall receive thirty-five (35%) percent of the said assets. The Court directs the attorneys for the Plaintiffs and for the Defendants, acting together, to determine the specific dollar amounts to which each individual in each class shall be entitled, and to make a written report thereof to the Register of this Court, who will, after the approval of the report by this Court, make distribution of the said funds in accord therewith."
The decree went on to make detailed provision for the winding up of the Club's affairs and the handling of the funds realized from sale of the Club's assets.
Some additional factual background is the following. In September 1979 Hurricane Frederic destroyed the Club's facilities. As a result the arrangement with the Elks was mutually cancelled, and in December of 1979 the Club's board of directors appointed a "feasibility study committee" to consider the Club's future. On June 8, 1980, the Club's active members voted to adopt a plan of dissolution, calling for sale of the Club's property and distribution of the proceeds to them in accordance with the by-laws. The Club then ceased to function except for a dissolution committee which notified the inactive members about their right to receive reimbursement for the purchase price of their certificates.
After post trial motions were denied on June 29, 1982, appeals were filed, beginning with two separate notices of appeal on August 9, 1982, by the Club and by five named active members. The latter claimed to appeal "individually and as representatives of all members of the Gulf Fishing and Boating Club, Inc., designated by the Circuit Court of Mobile County as `plaintiffs'." The appellees, in addition to filing their own cross appeal, have moved to dismiss the appeals of the Club and the five named active members. We consider this matter before reaching the merits.
 RIGHT TO APPEAL
The appellees seek dismissal of the Club's appeal on the ground of untimeliness. They seek dismissal of the other appeal on the ground that the five named active members were never certified as class representatives under Rule 23, A.R.Civ.P., and failed to give notice of their appeal to the remaining 40 active members. We agree with the appellees that these five named individuals never appeared separately below, never obtained representative status pursuant to a Rule 23 class action certification, *Page 1366 
and accordingly have no standing to appeal. This conclusion, however, has no real effect, because we also conclude that the appeal by the Club is timely. Since the Club has argued the position of the active members throughout this litigation, dismissal of the appeal of the five named active members does not affect their right.
The appellees contend that the Club's appeal cannot be timely because the Club ceased to exist on January 26, 1981, when the order of dissolution was entered. In our view the Club must be deemed to continue in existence beyond the date of the order of dissolution for purposes of this litigation. The language of the trial court's decrees and the actions of the parties in pursuing the litigation in the Club's name in order to resolve the problem of distributing its assets are consistent with this view. Moreover, even if the order of dissolution ended the existence of the Club for some purposes, under Code of 1975, § 10-3-172, we have no authority to allow the formal event of dissolution to affect the substantial rights of the parties in the manner urged by the appellees. This statute provides:
 "The dissolution of a corporation shall not take away or impair any remedy available to or against such corporation, its directors, officers or members for any right or claim existing, or any liability incurred, prior to such dissolution if action or other proceeding thereon is commenced within two years after the date of such dissolution. Any such action or proceeding by or against the corporation may be prosecuted or defended by the corporation in its corporate name. The members, directors and officers shall have power to take such corporate or other action as shall be appropriate to protect such remedy, right or claim. If such corporation was dissolved by the expiration of its period of duration, such corporation may amend its articles of incorporation at any time during such period of two years so as to extend its period of duration."
See generally H. Oleck, Nonprofit Corporations, Organizationsand Associations, ch. 42 (4th ed. 1980). Since the appellees have throughout asserted their claims against the active members by participating in litigation with the Club as the adverse party, we see no reason why the litigation should not be concluded on the same basis.
 ARGUMENT OF ACTIVE MEMBERS
The trial court held — apparently as a matter of law — that the certificates of membership gave the inactive club members a vested "contract right" or "property right" to receive a pro rata share of the assets on dissolution and that these certificates overrode any other corporate documents limiting this right. The trial court also found as fact that the Club representatives "gave the impression" to purchasers that the certificates represented an entitlement to share in the assets of the Club upon its dissolution and further that subsequent actions by the Club ratified this impression. The active members dispute both the factual and legal conclusions.
First, the active members argue that the 1958 articles of incorporation, the certificates, and every version of the corporate by-laws by their terms all preclude the inactive members from sharing in the distribution of assets. On this view no conflict exists between the certificates and subsequent by-laws, with the result that no deprivation of vested rights could have occurred. The active members' contention seems to be two-fold: (1) that since the certificates were expressly made subject to later amendments in the corporate charter and by-laws, no vested right could have accrued, and (2) that the inactive members cannot be considered to come within the meaning of the certificate provision referring to "members of the corporation holding certificates of membership." (Emphasis added.) This second point is supported by the fact that both the 1973 and 1980 versions of the corporate by-laws provide "that any member failing to pay dues or bills within 60 days after they become due shall be automatically dropped from membership." *Page 1367 
The inactive members had not paid dues and thus were arguably not members.
We cannot accept these contentions. First, the certificates purport to certify "membership"; no indication is given that this primary aspect of the certificates could be later voided by amendments to other corporate documents. In addition, the 1973 and 1980 by-laws do not specifically purport to nullify the certificates as proof of membership in some form. Thus, the term "members" in the certificate must be equated with "certificate holders." The question then becomes whether the certificate provision giving "members of the corporation holding certificates of membership" a claim to distribution on a pro rata basis is affected by the earlier provision making the certificate subject to the corporate charter and by-laws as amended.
Corporate documents such as bylaws and membership certificates are equivalent to contracts among the members of the organization. H. Oleck, supra, at 985. Accordingly, normal rules of construction for contracts apply. The initial question is to determine, as a matter of law, whether the contract is ambiguous. Extrinsic evidence may be considered to resolve a latent ambiguity arising from some collateral matter outside the writing. If the contract is not ambiguous, then its interpretation is a matter of law for the court to determine without reference to extrinsic evidence. If the court instead finds the contract to be ambiguous, then its interpretation is a question of fact, and extrinsic evidence may be considered.Brown Mechanical Contractors, Inc. v. Centennial Ins. Co.,431 So.2d 932 (Ala. 1983). If extrinsic evidence of surrounding circumstances does not clarify the ambiguities, then the contract must be construed against the party who drafted it.Molton, Allen Williams, Inc. v. St. Paul Fire Marine Ins.Co., 347 So.2d 95, 99 (Ala. 1977). In the present case that party is the Club.
In our view the terms of the certificate and by-laws are ambiguous when read together. As noted by the trial court, the provision regarding distribution of assets is more specific than the general provision making the certificate subject to later amendments. It seems illogical to allow a later by-law amendment to nullify the one aspect of Club membership that was specifically stated in the certificates.
The first piece of extrinsic evidence that should be consulted in such a case is the 1958 articles of incorporation, to which the certificates and by-laws must conform. In relevant part, these provide:
"ARTICLE IV — MEMBERSHIP
 "The classes of members in the Corporation and the qualification and method of selecting of which shall be set out in the By-Laws of the Corporation.
"ARTICLE V — GOVERNMENT
". . . .
 "(b) By-Laws. The members of the Corporation may adopt such By-Laws as they shall deem desirable and may amend the same from time to time as provided in said By-Laws, provided that said By-Laws are not inconsistent with these Articles of Re-incorporation or with the laws of the State of Alabama.
". . . .
"ARTICLE IX — DISSOLUTION
 "Upon any dissolution or final liquidation of the Corporation, distribution of the net assets of the Corporation remaining after payment of all the debts and obligations of the Corporation shall be made to the members of the Corporation then in good standing per capita, provided that no part of the net earnings thereof shall enure to any individual member."
(Emphasis added.)
The articles of incorporation do not answer the question posed above, since "in good standing" is not defined and it is left to the by-laws to set out the qualifications for members. Also relevant is the 1960 corporate resolution authorizing the certificates. This resolution provides in part:
 "Be it further resolved that this corporation issue to members of this club who may purchase the same non-interest bearing debentures or preferred certificates upon payment for each certificate of the *Page 1368 
sum of $250.00 payment therefor to be made at such time and such manner as the Board may direct. Such certificate may be negotiated. All proceeds of each such debenture or partial payments therefor shall constitute a trust fund when received to be applied to a reduction of the principal and interest on the $30,000.00 loan referred to above. Holders of such debentures shall not by virtue thereof have any lien or mortgage on the properties of the corporation but shall, in event of liquidation of the properties, be preferred in payment from such proceeds in the liquidation to the end that such holders shall be paid the amount of debentures owned by them before there is any distribution among share holders or members of the assets in liquidation.
 "Be it further resolved that to carry out the spirit and interest of this resolution the Board is empowered to provide all forms and terms to be incorporated into the debenture or preferred certificates and that the amount of such debenture offered or sold shall be unlimited. Any excess received above the amounts necessary to discharge the $30,000.00 loan may be used at any time for further capital improvements of the club properties."
The last sentence of the first paragraph quoted appears to support the active members' view in that a distinction is made between certificate holders who are "paid the amount of debentures owned by them" and "share holders or members" receiving the assets in liquidation. However, this resolution appears to have been loosely drafted. Its reference to shareholders is inconsistent with Code of 1975, § 10-3-125, which provides that a nonprofit corporation "shall not have nor issue shares of stock." In addition, the resolution authorizes the board of directors to provide specific "forms and terms" for carrying out "the spirit and interest of this resolution." In view of these facts, we do not see the resolution as a useful indicator of the meaning of the certificates.
It is next appropriate to consider the successive by-laws for indications of what parts of the certificate were meant to be subject to change. The by-laws of 1958, 1961, 1965 and 1973 all require distribution to "active members in good standing at the time of dissolution." All versions of the by-laws prior to the arrangement with the Elks in 1970 defined active members as those who are approved for membership by the board of directors and pay the initiation fee.[1]
After the Club entered into its arrangement with the Elks in 1970, the by-laws *Page 1369 
were amended in 1973 to provide for membership as follows:
 "2.1 CLASSES. Membership in the Club shall consist of and include the following classes: active and inactive. All members shall be holders of Certificates of Membership.
 "2.2 ACTIVE MEMBERS. Active members are ones who are in `good standing' and who have purchased or are purchasing a Certificate of Membership (Debentures) as of September 18, 1970).
 "2.3 INACTIVE MEMBERS. Inactive members are ones who have a paid-up Certificate of Membership but are no longer active in the Club as of September 18, 1970.
 "2.4 TERMINATION OF MEMBERSHIP. The membership of any person may be terminated in either of the following ways:
 "(a) Non-payment of dues and bills. Any member who fails to pay his indebtedness to the Club within sixty (60) days after the same becomes due shall be automatically dropped from membership.
"(b) For Cause. . . .
 "(c) Discontinuation of Membership. Any member of the Club wishing to discontinue his membership will submit a letter of resignation to the Board."
The 1973 by-laws make clear that, notwithstanding the provision for automatic termination of "membership" for nonpayment of dues, membership in the Club, active or otherwise, could be continued without payment of dues (as the trial court recognized). These by-laws for the first time refer to certificate holders, which are equated with members. Since none of the earlier by-laws had been amended to refer to the certificates and none had made a distinction between active and inactive members, it is arguable that the 1973 bylaws were simply intended to state the Club members' understanding of their status ever since the certificates were issued. It is also possible that the 1973 by-laws were intended to redefine their status to reflect the fact that some could not be active members of the Elks Club. It is not clear from the trial court's decree whether it viewed the 1973 by-laws as reflecting such an intent. In either case, these by-laws contain an internal contradiction when read with the certificates. Article 2.1 (defining membership) of the 1973 by-laws taken together with the certificate (giving distribution rights to all members) is inconsistent with Article 5.4 of those by-laws which limits distribution of the assets to "the active members of the Club in good standing at the time of dissolution." If the latter provision is to control, then the active members are correct in arguing that the 1980 by-laws did not alter in any manner the distribution rights of the members by eliminating the inactive classification. Article 2.1 of the 1980 by-laws states: "Membership in the Club shall consist of those active members paying dues as prescribed, in `good standing' and who have purchased, or are purchasing a Certificate of Membership
(Debenture) as of September 18, 1970." Article 5.4 of the 1980 by-laws provides that the assets of the Club "shall be equally divided among the members of the Club at the time of dissolution."
The trial court, in finding that the 1973 by-laws equated active and inactive members, protecting the distribution rights of both, made no mention of the provision in those by-laws specifically allowing distribution only to active members. As a result, the trial court saw the 1980 by-laws as departing from the terms of the 1973 bylaws. If, however, the active members are correct in arguing that both the 1973 and 1980 by-laws restricted distribution to the active members, then the validity of those by-laws depends on how we resolve the ambiguity noted above: whether the certificate provision regarding distribution is to be independent of amendments to the bylaws. Because none of the language discussed above resolves this ambiguity it is necessary to consider the trial court's factual findings.
The trial court found that representations were made to the certificate holders, leading them to believe that their claim to the assets on dissolution was indefeasible. *Page 1370 
The active members argue that the only testimony upon which such a conclusion could be based should have been excluded under the Dead Man's Statute, Code of 1975, § 12-21-163. We find it unnecessary to consider the effect of this statute, because, assuming the testimony in question should have been excluded, the trial court had sufficient evidence upon which it could have based its conclusion. Specifically, the fact that Club members received certificates after retiring from active
membership and then completing payment for their certificates, reveals a shared understanding that inactive members were to receive something more than reimbursement for the purchase price of certificates. This evidence is sufficient to resolve the ambiguity discussed above and show that the certificates were intended to create a right in all of the members to receive a pro rata share of the assets.
Since such a right existed, the amendments to the by-laws were subject to scrutiny to determine whether they improperly divested the inactive members of their claims. The traditional approach to this problem in the law of corporations is to determine whether such claims are "vested rights," in which case they may not be altered. In the context of business corporations, it has been said:
 "The `vested rights' terminology has been attacked as being confusing and meaningless. . . .
 "The Model [Business Corporation] Act swept away the vested rights doctrine by providing in detail what amendments a corporation can make to its articles. . . .
 "However, even with the decline of the `vested rights' approach, the courts have not held that a member of a corporation can be deprived, by amendment, of all rights created in the articles or by-laws. No definitive terminology has been developed. The courts and the writers have turned to the more indefinite tests of `fairness', `good faith,' `reasonableness,' and lack of `constructive fraud.' . . .
". . .
 "For example, in Topkis, Ex'r. v. Delaware Hardware Co., 23 Del. Ch. 125, 2 A.2d 114, 119
(1938), [involving the elimination of voting rights by amending the articles of incorporation] the Court of Chancery upheld the amendment:
 "`* * * The question in such cases is whether the supposed advantage which the exercise of the power is said to intend to secure, is one that a court of equity would pronounce to be unfair to others who are affected thereby. Where as here the exercise of the power is one that is designed to change voting rights as allowed by the statute and the change is not aimed to accomplish an ulterior purpose beyond itself that can be denominated as inequitable, no ground exists for interference. * * *' 23 Del.Ch. at 135, 2 A.2d at 119."
Dentel v. Fidelity Savings Loan Assn., 273 Or. 31,539 P.2d 649 (1975). It is clear that the trial court did find as a fact that the active members had an ulterior purpose that can be denominated as inequitable. Under the standard applied in theDentel case, such a finding provides a basis for invalidating the amendments to the by-laws that affect the rights of the certificate holders to receive a pro rata distribution of assets.
We recognize that members or shareholders of a corporation are deemed to have constructive notice of the corporate by-laws and amendments to them, especially in a case such as this one where membership certificates specifically referred to bylaws as amended. See Supreme Commandery of the Knights of the GoldenRule v. Ainsworth, 71 Ala. 436 (1882); H. Oleck, supra, at 408;Mobile Press Register, Inc. v. McGowin, 271 Ala. 414,124 So.2d 812 (1960). It is especially true, however, as noted above, that by-laws are traditionally subject to scrutiny under a standard of protecting vested rights or preventing unfairness. In modern corporation law such scrutiny is quite limited, because courts are reluctant to create doctrines that could interfere with the flexibility needed by commercial corporations to adjust to changing business conditions and needs. However, this reason for *Page 1371 
limited judicial scrutiny is inapplicable here, because cutting off the claims of the inactive members in no way serves the needs of a non-profit corporation that is going out of existence.
Moreover, a distinction can be made between by-laws that "are mere regulations governing the conduct of the internal affairs of the corporation," and those "in the nature of a contract which are evidently designed to vest property rights inter se
among all stockholders." Bechtold v. Coleman Realty Co.,367 Pa. 208, 79 A.2d 661, 663 (1951). A general reservation of the power to amend is more naturally applied to the former class of by-laws and should be narrowly construed to avoid making "the contract subject to change in any essential particular at the election of one in whose favor the reservation is made." Ayersv. Grand Lodge A.O.U.W. State of New York, 188 N.Y. 280,80 N.E. 1020, 1021 (1907). See generally 8 W. Fletcher, Cyclopediaof the Law of Private Corporations, § 4177 at 622-23 (rev. perm. ed. 1982). This reasoning is applicable in the present context.
 ARGUMENT OF INACTIVE MEMBERS
Although the trial court properly construed the certificates and by-laws for the reasons discussed above, it then departed from the provision it upheld by allocating only 35% of the proceeds to the inactive members instead of a pro rata share. We see no justification for this result. As discussed above, each certificate is a contract. The trial court had authority to construe the contracts but not to rewrite them on the basis of "the equities involved in this proceeding." The parties discuss the circumstances of several individual members to argue that the result reached by the trial court was in fact inequitable. We do not consider these individual circumstances, because we have no authority to depart from the terms of the "contracts" as we have construed them.
 MRS. ROSEMARY BENDER
The trial court found that Mrs. Bender was the widow of Tom Bender, who had paid membership dues until his death, after which she continued to pay dues under a widow's membership privilege in the Club. Neither Mr. Bender nor Mrs. Bender had ever been required to purchase a certificate of membership. The trial court found this arrangement invalid because it was unauthorized under the by-laws. However, because Mr. and Mrs. Bender had relied upon the validity of the arrangement and had always paid their dues, the trial court concluded that "equity would indicate that active membership status should be accorded to Mrs. Bender and the Court so rules." Mrs. Bender separately appealed and argues that the other active members should be estopped from denying her claim to active membership status. She asks that the trial court's judgment be reversed insofar as it holds that the Club's waiver was invalid and affirmed in its holding that she is entitled to share in the sale proceeds on the same basis as the other active members.
We agree with the conclusion of the trial court for a somewhat different reason. It is undisputed that the board of directors originally waived the certificate requirement in recognition of the fact that Mr. Bender had spent his own funds for improvement of a marina facility he was leaving to the Club. Thus, Mr. Bender did in fact supply the consideration required by the 1960 resolution, and all that the board did in effect was to dispense with the paper work of issuing the certificate. This substantial compliance with the corporate requirements, in combination with the subsequent actions by both the Benders and the Club, estops the Club from now denying Mrs. Bender's membership. Draughon v. General Finance CreditCorp., 362 So.2d 880 (Ala. 1978). Those subsequent actions included the payment of dues, participation in Club affairs by the Benders, and the Club's consistent treatment of them as members.
For the above reasons the judgment is affirmed in part and reversed in part, and the case remanded for further proceedings in accord with this opinion. *Page 1372 
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.
TORBERT, C.J., and MADDOX, JONES and SHORES, JJ., concur.
[1] The 1958, 1961 and 1965 by-laws contain the following provision regarding membership:
"2.1 Classes. Membership in the Club shall consist of and include the following classes: (a) active, (b) associate, and (c) non-resident.
"2.2 Active Member. Any person who (a) shall be approved for membership by the Board of Directors and (b) shall pay the initiation fee for new members as provided by the Board of Directors shall be known as an active member and shall be entitled to all the rights and privileges to which an active member is entitled as prescribed herein; provided, however, that at no time shall the active members of the Club exceed four-hundred (400) in number. Any wife or husband of a deceased active member in good standing at his or her death can become an active member upon notice without the payment of an initiation fee.
"2.3 Associate Member. Any person who is the wife or husband or minor child of an active or non-resident member shall be known as an associate member and shall be entitled to all the rights and privileges of membership except the right to vote and to hold office in the Club.
"2.4 Non-Resident Member. Any person (1) who qualifies as an active member and (2) who lives in an area as determined from time to time by the Board or the membership shall be known as a non-resident member and shall be entitled to all the rights and privileges of membership except the right to vote and to hold office in the Club.
"2.5 Termination of Membership. The membership of any person may be terminated in either of the following ways:
"(a) Non-payment of dues and bills. Any member who fails to pay his dues or indebtedness to the Club within sixty (60) days after the same becomes due shall be automatically dropped from membership. Any person whose membership has been terminated for reason of failure to pay his dues or indebtedness to the Club as provided herein may be re-instated only with the approval of the Board. . . .
"(b) For cause. . . ."