LACOS LAND COMPANY, Plaintiff,

v.

ARDEN GROUP, INC., a Delaware corporation, Bernard Briskin, Philip L. Caret, Anson I. Dreisen, Thomas L. Karsten, Stuart A. Krieger, Chester I. Lappen, Daniel Lembark, Curtis H. Palmer, Frederick A. Schnell, and Ben Winters, Defendants.

Civ. A. No. 8519.

Court of Chancery of Delaware, New Castle County.

Submitted: July 14, 1986.
Decided: July 31, 1986.

---

Michael Hanrahan, William Prickett, James L. Holzman and Norman L. Pernick of Prickett, Jones, Elliott, Kristol & Schnee, Wilmington, for plaintiff.

A. Gilchrist Sparks, III, Kenneth J. Nachbar, and Michael Houghton of Morris, Nichols, Arsht & Tunnell, Wilmington, for defendants.

ALLEN, Chancellor

This action constitutes a multi-pronged attack upon a proposed recapitalization of defendant Arden Group, Inc., authorized by a vote of Arden's shareholders at their June 10, 1986 annual meeting. The recapitalization, if effectuated, will create a new Class B Common Stock possessing ten votes per share and entitled, as a class, to elect seventy-five percent of the members of Arden's board of directors. This new stock is, pursuant to the terms of a presently pending exchange offer, available on a share-for-share basis to all holders of Arden's Class A Common Stock. It is, however, acknowledged by defendants that the new Class B Common Stock has been deliberately fashioned to be attractive mainly to defendant Briskin—Arden's principal shareholder and chief executive officer. Thus, the recapitalization is not itself

a device to raise capital but rather is a technique to transfer stockholder control of the enterprise to Mr. Briskin.

Plaintiff is an Arden stockholder owning approximately 4.5% of Arden's Class A Common Stock; an additional stockholder owning approximately 4.6% of that stock has moved to intervene in this action as a plaintiff. Defendants are the members of Arden's board of directors. Pending is an application to preliminarily enjoin the issuance of Class B Common Stock which was originally scheduled to occur on July 18, 1986, but which has been voluntarily delayed by defendants.

The legal theories proffered to support the relief now sought fall into three categories. First, plaintiff claims that the June 10, 1986 shareholder vote approving the charter amendment that authorized the new Class B stock was fatally defective by reason of material misrepresentations and omissions in the Company's proxy statement. Second, it claims that the pending exchange offer constitutes an impermissible entrenchment scheme designed principally to thwart all possible changes in corporate control not personally agreeable to Mr. Briskin and to perpetuate him in office. Third, in a series of technical corporation law arguments plaintiff asserts that the charter amendments authorizing the issuance of the supervoting stock are inconsistent with certain provisions of the Delaware General Corporation Law and were not adopted by a supermajority vote as purportedly required by Arden's restated certificate of incorporation.

I find it unnecessary to address plaintiff's claims of impermissible motivation or its technical corporation law arguments. I conclude for two independent reasons that the stockholder vote amending the certificate so as to permit the issuance of the supervoting Class B stock is likely to be found on final hearing to be fatally flawed

and the amendments it approved voidable. Thus, finding a probability of ultimate success and having balanced the competing equities as a motion of this kind requires, see *Shields v. Shields*, Del.Ch., 498 A.2d 161 (1985), I conclude that the pending motion should be granted.

### I.

The new supervoting common stock whose issuance is sought to be enjoined will differ from Arden's other authorized class of common stock, Class A Common Stock, most importantly, in its enhanced voting power, its diminished dividend rights and in restrictions upon its transfer.

Specifically, with respect to voting rights, the recent charter amendment provides that "on every matter submitted to a vote or consent of the stockholder, every holder of Class A Common Stock shall be entitled to one vote ... for each share ... and every holder of Class B Common Stock shall be entitled to 10 votes ... for each share....".

As to the election of directors, the restated certificate provides that Class A shares, together with the Company's preferred stock, voting as a class shall "be entitled to elect 25% of the total number of directors to be elected" rounded up to the nearest whole number. The Class B shares are entitled to vote as a separate class and to elect the remaining 75% of directors to be elected.[1]

With respect to dividend rights, Class A Common Stock will, following the initial issuance of Class B shares, have the right to receive a one-time dividend of $.30 per share; Class B shares are to have no right to participate to any extent in that cash dividend. Excepting this one-time $.30 dividend, each share of Class B stock is to be entitled to participate in all dividends declared and paid with respect to a share of

---

1. If, on the record date for the meeting to elect directors, the Class B shares equal less than 12½% of the total of Class A and Class B shares together, then Class A will continue to vote as a class in the filling of 25% of the positions to be filled but will have the right to vote in the Class B election as well, with Class B shares continuing to be entitled to ten votes per share.

Class A stock but only to the extent of 90% of such dividend.

Class B shares may be transferred only to a Permitted Transferee,[2] but under certain circumstances may be converted on a share-for-share basis into Class A stock. A transfer of Class B to a person other than a Permitted Transferee at a time when conversion to Class A would be permitted would convert the transferred stock into Class A stock. Generally, Class B stock may, at the option of the holder, be converted to Class A stock on a share-for-share basis at the earlier of (i) the third anniversary of its issuance or (ii) the death of the holder.

Defendant Briskin owns or controls 16.9% of Arden's Class A Common Stock (21.1% were he to exercise certain presently exercisable stock options). The proxy statement states (at p. 20):

> Based on Mr. Briskin's expressed intention to exchange all of the Briskin Shares for Class B Common Stock, the Briskin Shares would represent approximately 67.7% of the combined voting power of the capital stock of the Company if no shares of Class A Common Stock other than the Briskin Shares were exchanged for Class B Common Stock.
>
> * * * * * *
>
> In view of the lack of transferability and reduced dividend rights of the Class B Common Stock, the Board of Directors does not anticipate that any significant number of holders of Class A Common Stock other than Mr. Briskin will accept the Exchange Offer.

## II.

The creation of a dual common stock structure with one class exercising effec-tive control of the company is, of course, not a novel idea,[3] although it is one that, thanks to its potential as an anti-takeover device, has recently emerged from the reaches of the corporation law chorus to strut its moment upon center stage where corporate drama is acted out.[4] In this instance, the notion of employing this dual common stock structure apparently originated with defendant Briskin.

Mr. Briskin became Arden chief executive officer in 1976 at a time when the Company was apparently in a desperate condition. Its stock was then trading between $1 and $2 per share. Briskin's stewardship has apparently been active and effective. While Arden has paid no dividends since 1970, during Briskin's tenure Arden's stock price has risen steadily; currently Arden common stock is publicly trading at around $25 per share, a price somewhat higher than the range of prices at which its stock traded in the weeks prior to the announcement of the plan that is the subject matter of this litigation.

■ In instigating the dual common stock voting structure, Mr. Briskin was apparently not responding to any specific threat to existing policies or practices of Arden posed by a specific takeover threat. Rather, he apparently was motivated to protect his power to control Arden's business future. Such a motivation, while it may be suspect—since it may reflect not a desire to protect business policies and capabilities for the benefit of the corporation and its shareholders but rather a wish simply to retain the benefits of office—does not itself constitute a wrong. *See, e.g., Unocal Corp. v. Mesa Petroleum Co.,* Del. Supr., 493 A.2d 946, 955 (1985); *Kaplan v.*

---

**2.** For a natural person Permitted Transferees include (1) the holder's spouse or any lineal descendant of a grandparent of the holder or the holder's spouse, (2) the trustee of any trust for the benefit of the holder or a Permitted Transferee, (3) charitable organizations, (4) a corporation or partnership under majority control of the holder or a Permitted Transferee and (5) the holder's estate.

**3.** *See, General Investment Co. v. Bethlehem Steel Corp.,* N.J.Ch., 87 N.J.Eq. 234, 100 A. 347 (1917).

**4.** *See,* Buxbaum, *The Internal Division of Power In Corporate Governance,* 73 Calif.L.Rev. 1671, 1713 (1985); Vise, *NYSE Ends 'One-Share, One-Vote' Rule,* Washington Post, July 4, 1986, at p. F–1.

*Goldsamt,* Del.Ch., 380 A.2d 556, 568–69 (1977).

In this instance, Briskin initially took his idea to the board of directors at its November 22, 1985 meeting. The Board established a three member committee of non-officer directors to consider the matter. Prior to the committee's first meeting, its chairman sent the other two committee members the proxy statement of another company that had adopted a dual class common stock structure, together with materials on other companies that had adopted supervoting plans and some materials relating to a report written by Professor Fischel on "Organized Exchanges and the Regulation of Dual Class Common Stock". The special committee retained neither independent counsel nor an independent financial advisor. At its first meeting, held on April 7, 1986, the chairman of this group distributed to the committee a draft report that he had previously prepared which gave approval to a supervoting stock plan. The committee reviewed this draft and suggested changes. The chairman noted the suggested changes and prepared a final three page report which was signed four days later at the committee's second, and final, meeting.

The committee's report was presented to the board at its April 22 meeting at which time the board approved the supervoting stock plan.

At that meeting the board fixed the date of the Company's annual meeting for June 10, 1986. Management of the Company prepared a proxy statement describing the proposed charter amendments authorizing the new supervoting Class B Common Stock, describing the Exchange Offer by which it was proposed that such new stock be distributed and setting out the background of, and the reasons for, this proposal.

At the June 10 annual meeting the Arden stockholders approved the proposed certificate amendments. Of 2,303,170 shares outstanding, 1,463,155 voted in favor (64%) and 325,004 (14%) voted to reject the proposal. Of the affirmative votes, 427,347 were voted by Briskin or his family and 388,493 were voted by a trustee as directed by Arden's management. As to the preferred stock, 74.4% of the 136,359 shares outstanding voted in favor of the proposal, more than half of which were voted by a trustee as directed by Arden's management.

As a consequence of the stockholders' approval of the proposal, the Company, on June 18, 1986, distributed to all holders of its Class A Common Stock an Offering Circular offering to exchange for each share of such common stock one share of Class B Common Stock with the rights, preferences, etc. described above.

### III.

■■■ Our corporation law provides great flexibility to shareholders in creating the capital structure of their firm. *See, e.g., Providence and Worcester Co. v. Baker,* Del.Supr., 378 A.2d 121 (1977). Differing classes of stock with differing voting rights are permissible under our law, 8 *Del.C.* § 151(a); *Topkis v. Delaware Hardware Co.,* Del.Ch., 2 A.2d 114 (1938); restriction on transfers are possible, 8 *Del.C.* § 202, and charter provisions requiring the filling of certain directorates by a class of stock are, if otherwise properly adopted, valid. *Lehrman v. Cohen,* Del.Supr., 222 A.2d 800 (1966). Thus, each of the significant characteristics of the Class B Common Stock is in principle a valid power or limitation of common stock. The primary inquiry therefore is whether the Arden shareholders have effectively exercised their will to amend the Company's restated certificate of incorporation so as to authorize the implementation of the dual class common stock structure. The charge is that they have not done so—despite the report of the judge of elections that the proposed amendments carried—in part because the proxy statement upon which the vote was solicited was materially misleading and in part because the entire plan to put in place the Class B stock constitutes a

breach of duty on the part of a dominated board.

For the reasons that follow I conclude that plaintiff has demonstrated a reasonable probability that on final hearing it will be demonstrated that the June 10, 1986 vote of the Arden shareholders has been fundamentally and fatally flawed and that, therefore, the amendments to Arden's restated certificate of incorporation purportedly authorized by that vote are voidable. In summary, the basis for this conclusion is two-fold. First, I conclude provisionally on the basis of the record now available, that the June 10 vote was inappropriately affected by an explicit threat of Mr. Briskin that unless the proposed amendments were approved, he would use his power (and not simply his power *qua* shareholder) to block transactions that may be in the best interests of the Company, if those transactions would dilute his ownership interest in Arden. I use the word threat because such a position entails, in my opinion, the potential for a breach of Mr. Briskin's duty, as the principal officer of Arden and as a member of its board of directors, to exercise corporate power unselfishly, with a view to fostering the interests of the corporation and all of its shareholders. Second, I conclude provisionally, that the proxy statement presents a substantial risk of misleading shareholders on a material point concerning Mr. Briskin's status as a "Restricted Person" under Article Twelfth of the Company's certificate of incorporation.

### IV.

Judging from what is stated in the proxy materials, Arden's board in recommending the charter amendments and Arden's shareholders in approving them were both placed, inappropriately, in a position that made it significantly less likely than it might otherwise have been that approval of the plan to effectively transfer all shareholder power to Mr. Briskin would have been given.

To a shareholder who wondered why his board of directors was recommending a plan expected to place all effective shareholder power in a single shareholder, the proxy statement gives a clear answer: Mr. Briskin is demanding it; it's not such a big deal anyway since, as a practical matter, he has great power already; and if he doesn't get these amendments, he may exercise his power to thwart corporate transactions that may be in the Company's best interests. Thus, in order for the board to be "permitted to consider" (proxy p. 20) certain transactions that might threaten to reduce Mr. Briskin's control, the board approved the proposal. This story is disclosed more or less straight forwardly in the proxy solicitation materials.

As to Mr. Briskin's position, the proxy statement states (emphasis added throughout):

Purpose and Effects of the Proposal

1. **Purpose.** Mr. Briskin, the Company's largest single stockholder who beneficially owns in the aggregate approximately 21.1% of the outstanding Common Stock, has informed the Company of his concern that certain transactions *which could be determined by the Board of Directors to be in the best interests of all of the stockholders*, such as the issuance of additional voting securities in connection with financings or mergers or acquisitions by the Company, might make the Company vulnerable to an unsolicited or hostile takeover attempt or to an attempt at "greenmail," and that *he would not give his support to any such transactions for which his approval might be required unless steps were taken to secure his voting position in the Company.*

As to the asserted fact that Mr. Briskin already really has, as a practical matter, the power to control the Company, the proxy statement says (immediately following the foregoing quoted matter):

*As a practical matter*, given the present stock ownership of Mr. Briskin and certain supermajority vote requirements and other provisions of the existing Certificate (see "Possible Adverse Conse-

quences"), *explicit or implicit approval of Mr. Briskin would be required for every such major transaction* the Company might choose to engage in (whether or not a vote of stockholders is actually required). Similarly, *it is unlikely that the Company would engage in transactions to which Mr. Briskin is opposed. Such transactions, including the issuance of additional capital stock, although dilutive of Mr. Briskin's stock ownership, could be in the best interests of stockholders other than Mr. Briskin.*

Accordingly, the purpose of the proposal—stated at page 20 as "to allow the Company to engage in [a broad range of] ... activities ... without diluting the power of Mr. Briskin ..."—is restated more completely on the same page as follows:

> The Special Committee and the Board of Directors of the Company approved the proposed amendments to the Certificate and the proposed Exchange Offer based, in part, *on their judgment that the Company can enjoy superior long-term performance if permitted to consider* the desirability of *transactions which would significantly dilute Mr. Briskin's voting power* in the Company or which might otherwise subject the Company to some risk of an unsolicited or hostile takeover attempt and which might therefore be opposed by Mr. Briskin. The Board of Directors believes that *if the Proposal is approved and Mr. Briskin's voting power is increased* as described herein under "Effects on Relative Voting Power," *Mr. Briskin will be more inclined not to oppose such transactions* and *that the Proposal is therefore in the best interests of the Company* and all of its stockholders. See "Action by Board of Directors."

Thus, Arden shareholders were unmistakably told that should they fail to approve the proposed amendments, Mr. Briskin "would not give his support to any transaction [that might make the Company vulnerable to an unsolicited or hostile takeover attempt] for which his approval might be required ...". Using the term in the vague way which we ordinarily do, a vote in such circumstances as these could be said to be "coerced". But that label itself supplies no basis to conclude that the legal effect of the vote is impaired in any way. As stated in *Katz v. Oak Industries, Inc.,* Del.Ch., 508 A.2d 873, 880 (1986):

> ... [F]or purposes of legal analysis, the term "coercion" itself—covering a multitude of situations—is not very meaningful. For the word to have much meaning for purposes of legal analysis, it is necessary in each case that a normative judgment be attached to the concept ("inappropriately coercive" or "wrongfully coercive", etc.). But, it is then readily seen that what is legally relevant is not the conclusory term "coercion" itself but rather the norm that leads to the adverb modifying it.

The determination of whether it was inappropriate for Mr. Briskin to structure the choice of Arden's shareholders (and its directors), as was done here, requires, first, a determination of which of his hats—shareholder, officer or director—Mr. Briskin was wearing when he stated his position concerning the possible withholding of his "support" for future transactions unless steps were taken "to secure his voting position". If he spoke only as a shareholder, and should have been so understood, an evaluation of the propriety of his position might be markedly different (*see, Tanzer v. International General Industries, Inc.,* Del.Supr., 379 A.2d 1121, 1123 (1977); *Heil v. Standard Gas & Electric Co.,* Del.Ch., 151 A. 303, 304 (1930)) than if the "support" referred to could be or should be interpreted as involving the exercise of his power as either an officer or director of Arden.

On this point defendants' position at oral argument confirms that which the proxy language itself indicates—that, in taking this position, Mr. Briskin did not limit, and could not be understood to have limited, himself to exercising only stockholder power. Defendants have emphasized that Bris-

kin's "practical" power derives in part from his notable success as a chief executive officer; his history of success, I was reminded, creates influence and his position confers power to initiate board consideration of important matters. Moreover, the proxy statement made clear that the approval that Briskin threatened to withhold included approval of transactions that did not require a vote of stockholders. (*See*, proxy pp. 19–20 quoted above). Accordingly, the conclusion seems inescapable that, in announcing an intent to withhold support for corporate action that might entail, for instance, the issuance of stock, even if that act might be in the best interests of the corporation, unless "steps were taken to preserve his voting position", Mr. Briskin could not be understood to have been acting only as a shareholder.

 As a director and as an officer, of course, Mr. Briskin has a duty to act with complete loyalty to the interests of the corporation and its shareholders. *Weinberger v. UOP, Inc.*, Del.Supr., 457 A.2d 701 (1983); *Guth v. Loft*, Del.Supr., 5 A.2d 503 (1939). His position as stated to the shareholders in the Company proxy statement seems inconsistent with that obligation. In form at least, the statement by a director and officer that he will not give his support to a corporate transaction unless steps are taken to confer a personal power or benefit, suggests an evident disregard of duty. However, the nature of the *quid pro quo* sought by Mr. Briskin in this case is at least consistent with a benign or selfless motive. The Class B stock he sought to have the board recommend and the stockholders approve would transfer complete control of the enterprise to him for an indefinite period, but it is a control that may not be transferred generally [5] and so it is unlikely that Mr. Briskin was motivated to gain access to a control premium for his stock by insisting on a device of this kind as a price of his supporting certain types of future action.

Two alternative motivations suggest themselves. Mr. Briskin may have been motivated, as plaintiff warmly contends is the fact, by a selfish desire to protect his salary and the perquisites of his office from the threat to them that a hostile takeover of Arden would represent. The issuance of the Class B stock, in the totality of the circumstances present, will assuredly place Mr. Briskin in a position (1) to protect his tenure for as long as he wants to do so and (2) to negotiate and assure stockholder acceptance of the full terms of any change in control, including employment contracts or severance agreements.

On the other hand, Briskin may have been motivated selflessly to put in place the most powerful of anti-takeover devices so that he could be assured the opportunity to reject (for all the shareholders) any offer for Arden that he—who presumably knows more about the Company than anyone else—regards as less than optimum achievable value. Accordingly, while I regard the form of the Briskin position ("I, as fiduciary will not support ... unless a personal benefit is conferred") as superficially shocking, I recognize that Mr. Briskin's position as stated in the proxy statement is logically consistent with and may indeed in fact be driven by a benevolent motivation.

Mr. Briskin's motivation in fact, however, need not be determined in order to conclude that the stockholder vote of June 10, 1986 was fatally flawed by the implied (indeed, the expressed) threats that unless the proposed amendments were authorized, he would oppose transactions "which could be determined by the Board of Directors to be in the best interests of all of the stockholders". As a corporate fiduciary, Mr. Briskin has no right to take such a position, even if benevolently motivated in doing so. Shareholders who respect Mr. Briskin's ability and performance—and who are legally entitled to his undivided loyalty—were inappropriately placed in a position in which they were told that if they refused to vote affirmatively, Mr. Briskin would not

---

5. See footnote 2, *supra.*

support future possible transactions that might be beneficial to the corporation. A vote of shareholders under such circumstances cannot, in the face of a timely challenge by one of the corporation's shareholders, be said, in my opinion, to satisfy the mandate of Section 242(b) of our corporation law requiring shareholder consent to charter amendments.

## V.

■ I turn now to the alternative basis for my finding of a probability of ultimate success. It also relates to the integrity of the stockholder vote approving the amendments; in this case, however, it relates to the quality of the disclosure.

It is, of course, well established in our law that an element of the fiduciary duty that directors owe to shareholders is the duty, arising when the board is required or elects to seek shareholder action, to disclose fully and fairly pertinent information within the board's control. *Smith v. Van Gorkom*, Del.Supr., 488 A.2d 858 (1985); *Lynch v. Vickers Energy Corp.*, Del.Supr., 383 A.2d 278 (1978).

In this effort to assess whether defendants as fiduciaries have met their state law duty of candor in dealing with the corporation's shareholders, the Court applies a test similar to the test applied by federal courts when treating disclosure under the federal securities laws. *Rosenblatt v. Getty Oil Co.*, Del.Supr., 493 A.2d 929, 944 (1985). That test was set forth in *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976).

Thus, in assessing whether defendants have met their duty of candor with respect to the May 12, 1986 proxy statement, the Court must determine whether "there is a material likelihood that a reasonable shareholder would consider [an omitted fact] important in deciding how to vote.... What the standard ... contemplate[s] is a showing of a substantial likelihood that, under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable share-

holder. Put another way, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." 426 U.S. at 449, 96 S.Ct. at 2132.

For the reasons that follow, I conclude that plaintiff has shown a reasonable probability of ultimate success on its claim that the May 12, 1986 proxy statement was misleading in a way that was material to a reasonable shareholder voting upon the proposed recapitalization. Specifically, I conclude that the proxy statement's implication that Mr. Briskin would be a "Restricted Person" under Article Twelfth of Arden's restated certificate of incorporation is misleading in a way that was material in the circumstances. The matter is not altogether simple and, before turning to the disclosure itself, it may be helpful to focus on Article Twelfth and its relationship to Article Fourth (the amended article which provides for the issuance of Class B Common Stock). With that background in mind, we will then turn to the disclosure with which I am here concerned.

## A.

Article Twelfth requires that a merger or other business combination with an entity controlled by a "Restricted Person" be authorized by a supermajority vote of shareholders. Specifically, it states that "the prior affirmative vote or written consent of *the holders of 70% of the outstanding shares* of the common stock of the corporation, voting separately as a class" is required in order to authorize any "Business Combination" with a "Restricted Person" or his "Affiliate". In order to "amend, alter or repeal, directly or indirectly" any part of Article Twelfth, there is required, "notwithstanding any other provision of this Certificate of Incorporation," "the affirmative vote of the holders of 70% of the issued and outstanding *shares* of common stock ... excluding all voting securities

owned directly or indirectly by any Restricted Person ...".

Finally, a Restricted Person is defined, generally, as any person who has, during any period of twelve consecutive months, acquired 5% or more of the outstanding shares of any class of the Company's voting securities. However, in making the calculation of percentage ownership "shares shall not be counted ... if the transaction in which such shares were acquired was approved in advance" by two-thirds of the members of Arden's board of directors. The vote required by Article Twelfth is a special and distinct vote, under Arden's certificate, "in addition to the vote ... otherwise required by law ...".

The amendments to Arden's certificate approved on June 10, did not amend the language of Article Twelfth. Therefore, a "Business Combination" with a "Restricted Person" still requires the "affirmative vote ... *of the holders* of 70% of the outstanding *shares.*" Article Fourth now, however, provides that:

> On every matter submitted to a vote ... of stockholders ... every holder of Class B Common Stock shall be entitled to 10 votes ... for each share of Class B Common Stock standing in the holder's name
> ....

What is not immediately or obviously apparent is how Article Twelfth and amended Article Fourth relate to each other. That is, does the "affirmative vote ... of the holders of 70% of the stock" mean, after Article Fourth has been amended, that in the distinct vote required by Article Twelfth each holder of Class B stock will have 10 votes for each such share or does the literal meaning of the words "holders of 70% of the stock" require a different result? I raise this question not to answer it, but rather to acknowledge it as a part of the relevant background, in order to assess the adequacy of the proxy statement's treatment of the subject of the effect of the authorization and issuance of supervoting stock upon Article Twelfth and Mr.

Briskin's status under that Article, the subject to which we then turn.

### B.

In seeking shareholder approval of the proposed certificate amendments, the proxy statement reviewed the protections that Article Twelfth afforded. (*See*, proxy pp. 21–22.) The proxy statement did not state a view as to how those protections would, either legally or as a practical matter, be affected by the issuance of the proposed Class B stock. Nor did the proxy statement expressly state that Mr. Briskin (if, as it stated was expected to occur, he obtained most or all of the new Class B stock) would be a Restricted Person under Article Twelfth—but that is the clear implication that arises from the proxy statement's description of a Restricted Person and its statement that Briskin was expected to exchange all of his Class A stock for Class B if the amendments were approved. (*See*, proxy pp. 21–22.)

This implication is incorrect; Mr. Briskin will not be a Restricted Person under Article Twelfth since he would acquire his shares in a transaction approved by two-thirds of the members of Arden's board.[6]

Would such an incorrect implication be material, as above defined, to a shareholder asked to approve a proposal that he or she is told will have the likely consequence of delivering 67% of the voting power to Mr. Briskin? It could hardly be thought to be material if in voting affirmatively on the proposal a shareholder believed that Mr. Briskin would be able to cast his 67% *vote* in order to satisfy Article Twelfth's requirement ("the holders of 70% of the *stock*"). In that circumstance, it could not be considered important whether Briskin was or was not a Restricted Person.

But having read the proxy statement several times, I conclude that it is more likely than not that a reasonably attentive shareholder would—in the absence of a specific discussion of the inter-relationship

---

**6.** The proxy statement neglected to mention that fact.

between amended Article Fourth and Article Twelfth—rely upon the literal meaning of the words used to describe Article Twelfth and its effect, to conclude incorrectly that Mr. Briskin (whom he was lead to believe would be a restricted person) would not be able, if the proposal was approved, to satisfy the voting requirements of Article Twelfth essentially single-handedly. I also conclude that there is a material likelihood that such a conclusion would, considering the importance and character of the proposal (*cf., Blanchette v. Providence & Worcester Co.*, D.Del., 428 F.Supp. 347, 353–354 (1977)) and the entirety of the disclosure, be important to a reasonable shareholder deciding how to vote on this matter.

## VI.

■ Finally, I have considered the harm that may befall the Company, Mr. Briskin and the other shareholders if the closing of the Exchange Offer is preliminarily enjoined and, on a fuller record, that injunction is determined to have been improvidently granted. In the circumstances, I conclude that the balance of the equities favors plaintiff. I will, of course, not enjoin the declaration and payment of the $.30 per share dividend. That is a matter for the board to decide upon.

For the foregoing reasons, plaintiff's motion shall be granted. Plaintiff shall submit a form of implementing order on notice.