Michael EISENBERG, Plaintiff,

v.

CHICAGO MILWAUKEE CORPORA-
TION, a Delaware corporation, Robert
S. Davis, Clarence G. Frame, Edwin Ja-
cobson, Leon Levy, Alessandro di Mon-
tezemolo, Jack Nash, Robert C. Reed,
Peter J. Sharp, Emory Williams, and
Ezra K. Zilkha, defendants.

Civ. A. No. 9374.

Court of Chancery of Delaware,
New Castle County.

Submitted: Nov. 25, 1987.
Decided: Dec. 1, 1987.

William Prickett, Wayne N. Elliott, and Philip B. Obbard of Prickett, Jones, Elliott, Kristol & Schnee, Wilmington, and Ronald Litowitz of Bernstein, Litowitz, Berger & Grossman, New York City, for plaintiff.

R. Franklin Balotti, Jesse A. Finkelstein, Nathan B. Ploener, and James C. Strum of

Richards, Layton & Finger, Wilmington, and Dennis J. Block, H. Adam Prussin, Andrew J. Roth, and Richard W. Slack, of Weil, Gotshal & Manges, New York City, for defendants.

## OPINION

JACOBS, Vice–Chancellor.

On October 28, 1987, Chicago Milwaukee Corp., a Delaware corporation ("CMC") commenced a self-tender offer (the "Offer") for any and all shares of its $5 Prior Preferred Stock ("the Preferred"), at an offering price of $55 per share cash. Although the Offer was originally scheduled to expire on November 30, 1987, the expiration was extended to midnight, December 1, 1987.

On November 2, 1987, the plaintiff, a Preferred stockholder of CMC, commenced this class action against CMC and its directors. He attacks the validity of the Offer and seeks a preliminary injunction to prevent its consummation. Following expedited discovery and briefing, the motion was argued on November 25, 1987 and was considered over the Thanksgiving holiday weekend. This is the Opinion of the Court on the plaintiff's motion for a preliminary injunction.

## I. FACTUAL BACKGROUND

The critical facts are not in dispute. CMC is a Delaware corporation that is headquartered in Chicago, Illinois. CMC was formed in 1971 through an exchange offer in which CMC became the parent holding company of the Chicago, Milwaukee, St. Paul and Pacific Railroad Company (the "Railroad"). Many of the Railroad's preferred stockholders tendered into the exchange offer and as a result, they became holders of CMC common and Preferred stock. In 1977 the Railroad filed a petition for reorganization under the Federal Bankruptcy Act. Because it was sustaining heavy losses, the Railroad sold its railroad operating properties as well as valuable timberland. After the Railroad emerged from bankruptcy in late 1985, CMC and the Railroad sold off most of their assets as part of CMC's announced business plan to abandon previous lines of business and to acquire another business. CMC has retained several investment banking firms to seek out potential acquisition candidates.

CMC's principal assets presently consist of approximately $300 million in cash, plus real estate (including 66,000 acres of timberland) appraised at $90 million. As of September 30, 1987, the common stockholders' equity approximated $369 million.

CMC has two classes of stock. Approximately 2.5 million shares of common stock, and 463,946 shares of the Preferred, are issued and outstanding. As of October 27, 1987 the Preferred shares were held of record by 591 Preferred stockholders. Both the common and Preferred are listed and publicly traded on the New York Stock Exchange (NYSE), and are registered under the Securities Exchange Act of 1934.

The rights of the Preferred stock are limited. The Preferred has a $5 per year dividend right, but payable only "when and as declared by the Board of Directors". The dividend is noncumulative. The Preferred also has a liquidation preference of $100 per share, and may be redeemed at a value of $100 per share plus up to $7.50 of unpaid dividends per share. However, CMC is not obligated to redeem the shares (there being no requirement of a sinking fund or that other assets be set aside for that purpose) or to liquidate CMC at any time.

CMC's Certificate of Incorporation prohibits the payment of a dividend on the common stock in any given period, unless the Preferred dividend is paid first. But there is (to repeat) no requirement that any dividend be paid, and, in fact, no dividends have ever been paid on either the Preferred or the common stock since 1971. The Preferred stockholders may vote, along with common stockholders, for the eight regular members of the Board of Directors. However, if Preferred stock dividends are not paid for three semi-annual dividend payment dates, the Preferred, voting as a class, becomes entitled to elect two additional special directors. In 1985 defend-

ants Robert S. Davis and Alessandro di Montezemolo were elected as the special Preferred directors, and presently serve in that capacity.

The Company has declined to pay dividends on the Preferred. Although CMC has abundant liquidity (almost $300 million of cash) and although a relatively small percentage of that liquidity (approximately $2.32 million) would be required to pay the $5 dividend, CMC's management has adopted a "no-dividend" policy for the stated purpose of conserving assets for an acquisition. At CMC's most recent annual stockholder meeting held in June of 1987, several Preferred stockholders complained about CMC's refusal to pay dividends on (or to redeem) the Preferred. After the meeting, other Preferred stockholders wrote to CMC to voice similar protests.

CMC's directors do not own any appreciable amount of Preferred shares. The record does indicate, however, that CMC's directors, and the "Schedule 13D" shareholder group with which certain of those directors are affiliated, own a significant percentage of the common stock. As of May 1, 1987, CMC's directors as a group owned directly about 17% of CMC's outstanding common stock. Four of CMC's ten directors (Messrs. Levy, Nash, Sharp, and Zilkha) are members of the "Schedule 13D Group," which includes Odyssey Partners, a partnership of which Messrs. Levy and Nash are the general partners. As of August 6, 1987, directors and the Schedule 13D Group owned collectively 41% of CMC's common stock. Because Preferred dividends are noncumulative, CMC's policy of retaining earnings rather than paying dividends, operates to benefit the common stockholders generally, and the directors individually, because the directors own significant amounts of common stock.[1]

The trading price of the Preferred has fluctuated widely over the past decade. After the Railroad filed for bankruptcy, the Preferred traded as low as $10. Once the Railroad emerged from bankruptcy in 1985, the market price of the Preferred traded from a low of $55 to a high of $80.25. In 1986, the price fluctuated from a low of $57 to a high of $88.50. For the first three quarters of 1987, the price fluctuated from $53 to $78.50. From early 1987 to October 16, 1987, the price moved gradually downward, from a high of $78.50 in March, 1987, to a low of $62.50 on October 16, 1987.

On October 19, 1987, the stock market phenomenon popularly described as "Black Monday" occurred. On that date the Dow Jones Industrial Average as reported by the NYSE declined by 508 points, causing a sudden, significant decline in the market price of many listed securities, including CMC. The record shows that Black Monday was the originating force that motivated the decision to conduct the tender offer presently under challenge. On October 19 the Preferred stock price dropped another ten points, and by October 20, it had fallen to $42 per share. On October 27, the day before the Offer was announced, the Preferred closed at $41.50 per share.

The tender offer documents represented that "the movement in the market price of the [Preferred] Shares immediately prior to the commencement of the Offer was one of several considerations in the Company's decision to make the Offer." (Supplement to Offer to Purchase, p. 2). The record evidence indicates, however, that that $41.50 market price level—the lowest price at which the Preferred had traded since early 1983—was the predominant, if not the sole, factor motivating the directors' decision to make the Offer. Before Black Monday, CMC had never considered making a tender offer for the Preferred.

On October 20, 1987, defendant Edwin Jacobson, CMC's President, telephoned defendant Jack Nash, a fellow director, and suggested that CMC make a tender offer for the Preferred, since the stock price had declined substantially. Mr. Nash agreed and suggested that the Executive Committee consider the matter. A meeting by telephone took place on the following day,

---

1. Because dividends on the Preferred do not cumulate, the nonpayment of each Preferred dividend operates to increase the retained earnings of CMC, thereby increasing the common stockholders' equity.

October 21, 1987. At that meeting the Executive Committee decided to authorize Mr. Jacobson to retain legal counsel and investment bankers to advise the CMC Board. The Committee also decided that a special meeting of the Board of Directors would be held on October 27, 1987, six days later.

On October 23, 1987, Mr. Jacobson retained PaineWebber, Incorporated ("PaineWebber") as financial advisor, to evaluate and recommend an offering price that would be fair and would maximize the offer's chances of success.[2] PaineWebber performed its entire financial analysis over a three-day period, (the weekend and the following Monday, October 24, 25, and 26). The statistical data supporting PaineWebber's conclusions were presented to the Board for the first time at the scheduled October 27 meeting.[3]

As part of its valuation study, PaineWebber analyzed other securities "comparable" to the Preferred, to determine the yield and an appropriate price for those securities. PaineWebber relied upon certain public financial data and upon management's representations that CMC had no present intention to pay dividends or to redeem the Preferred shares. Based upon its analysis, PaineWebber concluded that the "intrinsic" or "fair" value of the Preferred was between $20 and $30—a value significantly lower than the current trading price.[4] Given that valuation, PaineWebber concluded that an offer at the current market price ($41.50) would be fair. PaineWebber recognized, nonetheless, that for a tender offer to succeed, it would have to be at a premium above market. Its study of other self-tenders revealed that the average premium paid in those transactions was 14% above market. On that basis, PaineWebber recommended that CMC offer at least a comparable (14%) premium, that is, an offering price of $48 per share.

Although CMC's directors received no written materials before the October 27, 1987 special meeting, PaineWebber's representatives did present their reasoning and conclusions orally at that meeting. When the 1 1/2 hour meeting concluded, the Board approved an "any and all" cash tender offer for the Preferred within a price range of $50 to $55 per share, delegating to the Executive Committee the task of selecting a specific offering price. There is no evidence that at that meeting the Board considered or discussed the need to "delist" or "deregister" the Preferred, the effect of delisting or deregistration upon the Preferred shareholders' investment, or the need to reduce CMC's administrative and bookkeeping costs (including costs of communication) relating to the Preferred stockholders.

In a short meeting held later that same afternoon, the Executive Committee fixed the offering price at $55 per share. The following day, October 28, 1987, the Offer was formally commenced, and CMC disseminated to all Preferred stockholders an Offer to Purchase bearing that same date.[5] Although the Offer to Purchase disclosed the opinion of both PaineWebber and the Board of Directors that the $55 offering price was fair, that document also admonished that neither CMC nor its directors were making any recommendation as to whether or not the Preferred shareholders should tender.

## II. APPLICABLE LEGAL STANDARDS

On a motion for a preliminary injunction, the plaintiff must show a reasonable probability of success on the merits, a reasonable likelihood of irreparable harm if injunctive

---

**2.** PaineWebber had been retained by CMC approximately nine months before to search for potential acquisition candidates. According to the Offer to Purchase, PaineWebber had previously rendered various investment banking and other advisory services to CMC.

**3.** No written materials were made available to CMC's directors before the October 27 meeting.

**4.** PaineWebber's low "intrinsic" valuation presumably flowed from the fact that the Preferred carries with it no guaranteed right to dividends or to redemption that would enable a shareholder to receive a certain return on his investment.

**5.** After this litigation was filed, the defendants disseminated a Supplement to the Offer to Purchase dated November 6, 1987 ("Supplement") which contained certain additional disclosures.

relief is not granted, and that the harm to the plaintiff if injunctive relief is denied outweighs the harm to the defendants if relief is granted. *Revlon, Inc. v. MacAndrews & Forbes Holdings,* Del.Supr., 506 A.2d 173, 179 (1986); *Gimbel v. The Signal Companies, Inc.,* Del.Ch., 316 A.2d 599, 602–03 (1974); *aff'd,* Del.Supr., 316 A.2d 619 (1974).

■ The plaintiff's motion for injunctive relief rests primarily upon two grounds. He first contends that the defendants violated their fiduciary duty to disclose with entire candor all material facts relating to the Offer. Second, he argues that the defendants violated their fiduciary duty of loyalty by structuring the Offer so as to impermissibly coerce the Preferred stockholders to tender their shares.[6]

The defendants argue that both the Offer and the directors' conduct were proper in all respects, and that no showing has been made that the Preferred stockholders will be irreparably harmed if the Offer is allowed to proceed. They further contend that any harm can be remedied in damages, and that an injunction would deprive the Preferred stockholders of perhaps their only foreseeable opportunity to realize a premium above market price for their shares.

For the reasons now set forth, the Court concludes that the plaintiff's motion must prevail, and that the Offer should be preliminarily enjoined during the time required to allow its deficiencies to be cured.

By its very nature and form, a tender offer is normally regarded as a voluntary transaction. Unlike a cash-out merger where public stockholders can be involuntarily eliminated from the enterprise, in a properly conducted tender offer the stockholder-offerees may freely choose whether or not to tender. That choice will normally depend upon each stockholder's individual investment objectives and his evaluation of the merits of the offer. Moreover, tender offers often afford shareholders a unique opportunity to sell their shares at a premium above market price. For those reasons, a tender offer that is voluntary (and that otherwise satisfies applicable legal requirements) will not be enjoined. *See, e.g., Lynch v. Vickers Energy Corp.,* Del.Ch., 351 A.2d 570, 573 (1976); *rev'd on other grounds,* Del.Supr., 383 A.2d 278, 279 (1977); *Klein v. Soundesign Corp.,* Del. Ch., C.A. Nos. 6636 and 6643, Marvel, C., (January 21, 1982) [Available on WEST-LAW, 1982 WL 8779].

■ However, as our Courts have recognized, a tender offer—particularly one made by a corporation for its own shares—may be voluntary in appearance and form but involuntary as a matter of reality and substance. Thus far two classes of situations have arisen that have been found to deprive a tender offer of its voluntary character: (i) cases involving materially false or misleading disclosures made to shareholders in connection with the offer (*e.g., Lynch v. Vickers Energy Group,* 383 A.2d at 281; *Kahn v. United States Sugar Corp.,* Del.Ch., C.A. No. 7313, Hartnett, V.C. (December 10, 1985) at 14 [Available on WESTLAW, 1985 WL 4449]; *Joseph v. Shell Oil Company,* Del.Ch., 482 A.2d 335, 342 (1984)), and (ii) cases where the offer, by reason of its terms or the circumstances under which it is made, is wrongfully coercive. (*See Kahn v. United States Sugar Corp.,* supra at 15–16; *AC Acquisitions Corp. v. Anderson Clayton & Co.,* Del.Ch. 519 A.2d 103, 114 (1986).)[7] If either cir-

---

6. The plaintiff also argues that the Court should enjoin the Offer because CMC's directors approved it with undue haste and without proper deliberation, *i.e.,* in violation of their duty to act with appropriate due care. The argument must be rejected on factual grounds: while the directors did act with haste, there is no showing on this record that their decision to make the Offer was not a reasoned or an informed one.

7. The actionable coercion may inhere in either the disclosures or in the terms of the offer itself.

In *AC Acquisitions Corp., supra,* 519 A.2d at 114, a corporate self-tender was found to be actionably coercive, and hence was enjoined, because of its timing in relation to a competing offer. In *Lacos Land Company v. Arden Group, Inc.,* Del.Ch., 517 A.2d 271 (1986), the issuance of a new class of "supervoting" preferred stock was enjoined on the ground that a disclosure in the proxy statement soliciting shareholder votes in favor of a charter amendment creating a proposed new class of preferred, was wrongfully coercive. The offending disclosure consisted of

cumstance exists, preliminary injunctive relief will follow.[8] Both circumstances are claimed to be present here.

## III. PROBABILITY OF SUCCESS ON THE MERITS

### A. *The Claim of Improper Disclosure*

The standard applicable to the plaintiff's disclosure claims is well established. Corporate directors owe a fiduciary duty to their stockholders to disclose all facts material to the transaction in an atmosphere of entire candor. *Smith v. Van Gorkom,* Del.Supr., 488 A.2d 858, 890 (1985); *Lynch v. Vickers Energy Corp., supra,* 383 A.2d at 281. That standard requires:

> [a] showing of substantial likelihood that under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable shareholder. Put another way, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information available.

*Rosenblatt v. Getty Oil Co.,* Del.Supr., 493 A.2d 929, 944 (1985) (quoting *TSC Industries, Inc. v. Northway, Inc.,* 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976)); *see also, Weinberger v. Rio Grande Industries, Inc.,* Del.Ch., 519 A.2d 116, 121 (1986).

Where a corporation tenders for its own shares, the exacting duty of disclosure imposed upon corporate fiduciaries is even "more onerous" than in a contested offer. That is because in a self-tender, the disclosures are unilateral and not counterbalanced by opposing points of view. As Federal District Judge Steel has stated:

Because of the uniqueness of the instant situation, defendants had a burden of disclosure which was more onerous than it would have been had a contest existed on the tender. This was emphasized in *Broder v. Dane,* 384 F.Supp. 1312, 1318–19 (S.D.N.Y.1974). There the Court recognized that an issuer making a tender offer for its own shares is "the most inside of insiders" and "the insider par excellence".

In the instant case the defendants were not only in a sense insiders but in their capacity as officers and directors of Railroad were fiduciaries for the stockholders. This imposed upon them the heavy responsibility of advising the stockholders fully and impartially about the advantages and disadvantages of the tender, especially in view of the personal interest which the defendants had in the success of the offer.

*Blanchette v. Providence & Worcester Co.,* 428 F.Supp. 347, 356 (D.Del.1977).

A related reason for requiring the strictest possible standard of disclosure is that corporate self-tenders, by their very nature, involve built-in conflicts of interest between the fiduciaries responsible for conducting the offer and the stockholders to whom the offer is directed. The interest of the corporate offeror (*qua* buyer) is to pay the lowest price possible; the interest of the stockholders (*qua* sellers) is to receive as high a price as possible. The directors are acting both as the representatives of the corporate offeror and as fiduciaries for the shareholder-offerees. That dual role necessarily gives rise to a potential conflict of the directors, which calls for procedural protections for the stockholders whose interests may not be adequately represented. The onerous disclosure standard described

---

a statement that unless shareholders voted to approve the amendments, the corporation's chief executive officer and largest stockholder would oppose transactions that the directors could determine were in the best interests of all stockholders.

8. *See, e.g., AC Acquisitions Corp., supra,* 519 A.2d at 114. (Self-tender by corporation timed so as to discourage free shareholder choice between corporation's offer and competing offer

by "outside" bidder, enjoined as actionably coercive); *Joseph v. Shell Oil Company, supra,* 482 A.2d at 343, (tender by parent corporation for publicly owned shares of 70%-owned subsidiary preliminarily enjoined, because offering documents failed to disclose facts tending to show the unfairness of the offering price and the deficiencies in the process by which the price was arrived at).

by Judge Steel in *Blanchette* represents one method of affording such protection.[9]

■ The plaintiff contends that the disclosures in the offering materials are deficient in numerous respects. Having considered plaintiff's disclosure contentions, the Court finds only those items discussed below to have probable merit. Whether each of those disclosure deficiencies standing alone would be so significant as to justify injunctive relief, need not be decided. All of those disclosure items, when taken together and considered against the background of the transaction, clearly demonstrate that the defendants have not met their disclosure obligations under Delaware law. *Joseph v. Shell Oil Company, supra,* 482 A.2d at 343.

### 1. *Disclosures Relating to the Purpose of the Offer*

■ The Offer to Purchase, on the first page, recites three separate purposes for the Offer. These are:

(i) to acquire the Shares at a price which the Company believes makes the Shares an attractive investment for the Company at this time;

(ii) to reduce the number and aggregate market value of the outstanding publicly held Shares and the number of Preferred Stockholders of record in order to effect the delisting of the Shares from the NYSE and the deregistration of the Shares under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), which should reduce the administrative and bookkeeping costs attributable to the Company's communication and other activities with its Preferred Stockholders; and

(iii) to provide the Preferred Stockholders with an opportunity to sell their Shares for a higher price than that available in the open market prior to the announcement of the Offer and without the usual transaction costs associated with open market sales, and further to allow qualifying Preferred Stockholders beneficially owning fewer than 100 shares to avoid the payment of brokerage commissions and the applicable odd lot discount payable on a sale of shares in a NYSE transaction.

The "third" purpose adds little, because it is a corollary of, (and is largely indistinguishable from) the first purpose. (For the Offer to succeed, CMC must also offer the Preferred shareholders a premium above the market price.) Thus, the Offer to Purchase, fairly read, discloses two separate purposes for the Offer: (1) to enable CMC to buy, and the Preferred shareholders to sell, their shares at what CMC believes is an attractive price for both the buyer and the sellers, and (2) to effect the delisting of the Preferred shares from the NYSE and the deregistration of those shares under the Securities Exchange Act of 1934, and to save costs related thereto.

The Offer to Purchase conveys the clear impression that the second (delisting/deregistration) purpose is a separate purpose, of coordinate importance with the first purpose, and of equal dignity. That impression is reinforced by the disclosure on page 2 that if, as a result of the Offer, the Preferred shares no longer meet the requirements for continued listing on the NYSE,[10] "... the company [CMC] intends to request delisting of the shares from the NYSE." The Supplement (at p. 2) also discloses that "the movement in the market price of the Shares immediately prior to the commencement of the Offer was *one of the several considerations* in the Company's

---

**9.** *See also Plaza Securities Co. v. Fruehauf Corp.,* 643 F.Supp. 1535, 1544 (E.D.Mich.1986) (holding that "judicial review of disclosures and nondisclosures must be especially rigorous" in context of management leveraged buyout where material facts are "exclusively within" the possession of management, whose interests "are in conflict with those of the shareholders."

**10.** According to the Offer to Purchase, the NYSE's published guidelines indicate that the

NYSE "would consider delisting the Shares if (i) the aggregate market value of publicly held Shares should fall below $2 million or (ii) the number of publicly held Shares would fall below 100,000 shares." (*Id.* at p. 2). That document also discloses that registration under the 1934 Exchange Act may be terminated upon certification by CMC to the Securities and Exchange Commission that there are fewer than 300 record holders of Preferred Shares. (*Id.*)

decision to make the Offer." (Emphasis added.)

These disclosures of the Offer's purported delisting/deregistration purpose are misleading. They clearly suggest that the Offer had a business-oriented, cost-saving, rationale, separate from and unrelated to the first Offer's purpose, which is to enable CMC to acquire the Preferred at an attractive price. Those disclosures further suggest that CMC's directors made a considered business judgment, unrelated to considerations of stock market price, to conduct the Offer in order to effect corporate cost savings.

Neither impression is accurate. The record shows, and at the oral argument defendants' counsel conceded, that the Offer is not being made to effect cost savings. Its purpose, plainly and simply, is to enable CMC to take advantage of the unprecedented "Black Monday" market crash that drove down the price of the Preferred to its lowest level in five years. The $55 offering price for the Preferred is attractive, because it is far less than the cost of redeeming the stock ($100 per share), and because the Offer, if successful, would eliminate the only legal barrier to the payment of dividends on the common stock. There was no consideration or discussion at any of the directors meetings of cost savings that would result from delisting or deregistering the Preferred, and any such cost savings would be minimal. In short, cost savings played either no role in the directors' decision to make the offer, or were at best a factor of minimal significance. In either event, it was materially misleading to portray cost savings as being a "purpose" of the Offer.

The shareholder-offerees are entitled to an accurate, candid presentation of why the self-tender offer is being made. *See, Blanchette v. Providence & Worcester Co., supra,* 428 F.Supp. at 354–355. There is nothing *per se* improper in a corporation deciding to make a noncoercive tender for its own stock to take advantage of a decline in stock market prices, so long as the shareholders are fully, candidly and accurately informed of all material facts.

The disclosures relating to the cost-savings "purpose" served not to enlighten but to obscure the real reasons motivating the Offer.

(2) *Disclosures Relating to the Fairness of the Price*

The plaintiff next contends that the $55 offer price is unfair and that the disclosures relating to that price were calculated to, and did, obscure and divert attention from that fact. If that were the case, the disclosures would clearly be defective. *Joseph v. Shell Oil Company, supra,* 482 A.2d at 342. Shareholders are entitled to be informed of information in the fiduciaries' possession that is material to the fairness of the price. *Id., Lynch v. Vickers Energy Corp., supra,* 383 A.2d at 281; *Kahn v. United States Sugar Corp., supra,* at 14. At this stage, the plaintiff has presented no evidence from which it can be found that the price is not fair. Indeed, on this record the Court is in no position to reach any affirmative conclusions one way or the other as to the fairness of the price. Nonetheless, the Court does find, preliminarily, that certain of the disclosures relating to the fairness of the price were less than entirely candid.

That portion of the Offer to Purchase which relates to the "Fairness of the Offer" (pp 3–4) discloses that (i) "the Board of Directors of the Company believes that the Offer, including the price to be paid per Share to be paid, is fair to tendering Preferred Stockholders" (ii) the Board had considered the analysis by PaineWebber, which had opined that the offering price was fair, and finally, (iii):

The current range of market prices was among the factors in the Board of Directors' determination. See Section 6. The directors concluded that, based upon recent market prices of the Shares and in light of recent stock market trends, the premium of approximately 33% (which represents the approximate percentage difference between the Offer price of $55 per Share and the reported last sale price of the Shares on the NYSE on October 27, 1987 ($41.50)) was both reasonable

from the Company's standpoint and fair to all of its stockholders.

While the quoted disclosure may be technically true, it fails to candidly disclose certain material facts relevant to the fairness of the price. Specifically, the "current range of market prices" was not simply "among the factors" considered by the Board. Rather, current market prices were the primary, if not predominant, factor motivating both the Offer and the $55 offering price. The euphemistic references to "recent stock market trends," the "current range of market prices," and the "premium of approximately 33%" over $41.50, were not counterbalanced by any disclosure of (i) the fact that the $41.50 price at which PaineWebber and the directors had pegged the premium was the lowest price level at which the stock had traded in five years, or (ii) the fact that $55 represented only a 5% premium above the ($52.50) "precrash" price level. Although the role played by PaineWebber (particularly its fairness opinion) was given considerable prominence, the fact that PaineWebber's work was done over a single long weekend was not disclosed. That omission, in these circumstances, was also material. *Joseph v. Shell Oil Company*, 482 A.2d at 343; *see also, Weinberger v. UOP, Inc.*, Del.Supr., 457 A.2d 701 (1983).

Had the foregoing facts been disclosed, shareholders would have been given a more even-handed presentation of the economic merits of the Offer. The need for such a presentation would appear even more essential, because the directors had concluded that the Offer was fair, yet decided not to recommend that their shareholders tender into it.[11]

11. The Court notes with some concern the directors' decision not to make any recommendation. Arguably, the reasons why these fiduciaries chose not to recommend the transaction that they approved would be important to shareholders considering whether or not to tender. Since this matter is not argued as a basis for injunctive relief, the Court need not reach that issue.

12. Although the Supplement improves upon the earlier disclosures, it does not adequately cure the deficiencies of the October 28 Offer to Purchase. The Supplement does disclose both the fact and the magnitude of the October 19, 1987

The defendants argue (correctly) that it is common knowledge that on October 19, 1987, the stock market (and the price of the Preferred) declined precipitously. But what is not common knowledge, and what the directors were obliged to candidly disclose, was the role played by the market decline and the "post-crash" price levels in the directors' conclusion that $55 was a fair offering price. Those facts were exclusively within the CMC's directors knowledge and control, and they were material (*Joseph v. Shell Oil Company, supra*, 482 A.2d at 341.)

Accordingly the Offer to Purchase is materially misleading in this respect as well.[12]

### 3. Disclosures Relating to the Directors Interest in the Success of the Offer

■ Finally, the Offer to Purchase does not adequately disclose that certain of CMC's directors had a potential conflict of interest by reason of their ownership of significant amounts of CMC's common stock. In this case an inherent conflict exists between the class of Preferred stock and the class of common. By decreasing the amount paid for the Preferred in the Offer, the directors correspondingly increase the amount of common shareholders' equity remaining in the corporation. Five of CMC's ten directors (Messrs. Sharp, Zilkha, Nash, Levy and Reed) personally owned over 17.1% of CMC's common shares, and Odyssey Partners, of which Messrs. Nash and Levy were general partners, owned 6.8% of CMC's common shares. The common stock holdings of the entire Schedule 13D group, when combined with the holdings of those directors, is 41%.

market crash, as well as the "precrash" Preferred stock prices. However, the Supplement does not balance the earlier reference to the 33% premium with a disclosure that the premium being offered above the precrash price is only 5%. Nor does it disclose the primary emphasis given by CMC's directors to the "post-crash" price levels in deciding to offer $55 per share. *See also Blanchette, supra*, 428 F.Supp. at p. 354 (holding that supplemental disclosure must specifically identify portions of original disclosure that are erroneous and being corrected.)

A successful offer would benefit those directors by increasing the book value of their common stock by $3.5 million. (See p. 26 of Plaintiff's Opening Brief).[13]

By its discussion of the CMC directors' potential conflict, the Court does not intend to suggest that those directors, in approving the offer, necessarily acted improperly or placed their individual interests over those of the Preferred stockholders. The only point made here is that in these circumstances, the potential conflict of half of CMC's Board of Directors was a fact that should have been disclosed. The Preferred shareholders were entitled to know that certain of their fiduciaries had a self-interest that was arguably in conflict with their own, and the omission of the fact was material. *Blanchette, supra,* 428 F.Supp. at 356.

### B. *The Claim of Inequitable Coercion*

The plaintiff also contends that, independent of disclosure, the Offer must be enjoined as being wrongfully coercive.

 The standard applicable to the plaintiff's claim of inequitable coercion is whether the defendants have taken actions that operate inequitably to induce the Preferred shareholders to tender their shares for reasons unrelated to the economic merits of the offer. *Ivanhoe Partners v. Newmont Mining Corp.,* Del.Ch., 533 A.2d 585, 605 (1987) and cases cited therein; *aff'd* Del.Supr., 535 A.2d 1334 (1987). Although the issue is not free from doubt, I conclude that the plaintiff has demonstrated a likelihood of ultimate success on the merits of his coercion claim.

The plaintiff argues that the Offer is inequitably coercive, because: (i) it was purposefully timed to coincide with the lowest market price for the Preferred since 1983, (ii) the offer occurs against the background of an announced Board policy of not paying dividends, despite CMC's present ability to do so, and (iii) CMC has announced that it intends to seek the delisting of the Preferred shares.

The defendants respond that the Offer, while perhaps "coercive" in the sense that its economic merits may make it more attractive to tender than not to tender, is not "actionably" coercive, because the defendants have committed no wrongful or inequitable coercive act.

In these circumstances the coercion issue is not easy to decide. To be sure, the directors have timed the Offer to coincide with the lowest Preferred stock price levels since 1983. They have also made a business judgment (one that at this stage must be presumed valid) not to pay dividends on, or to redeem, the Preferred. Given those circumstances, Preferred stockholders may perceive, not unreasonably, that unless they tender, they may not realize any return on or value for their investment in the foreseeable future. In that sense the offer does have coercive aspects. And the coercion may be attributed, at least to some extent, to acts of the directors (namely, their timing of the Offer and their no-dividend policy) rather than to market forces alone.

If these were the only relevant circumstances (and if proper disclosure was made of all material facts), the Court would have difficulty concluding, at least on this preliminary record, that the Offer is inequitably coercive. In what sense do corporate directors behave inequitably if they cause the corporation to offer to purchase its own publicly-held shares at a premium above market, even if the market price is at an historic low? So long as all material facts are candidly disclosed, the transaction would appear to be voluntary. The only arguable inequity is that if the offer is successful, it may result in a decrease in the number and market value of the outstanding shares and in the number of shareholders. That state of affairs, in turn, would create the possibility that shares not tendered will be delisted and/or deregistered. However, that possibility and its disclosure in the offering materials,

---

**13.** Further, a successful self-tender offer would eliminate the Preferred stock, and allow the directors to declare a dividend on the common stock alone. Presently, any dividend declared first be paid to the Preferred shareholders, and may only then be paid to the common shareholders.

without more, has been held to be not wrongfully coercive. *See Klein v. Soundesign Corp., supra* at 3; *Fisher v. Plessey Co.*, 559 F.Supp. 442, 451 (S.D.N.Y.1983).

In this case, however, the defendants have done more than simply acknowledge the possibility of delisting and deregistration; they have told the Preferred stockholders that CMC *"intends to request* delisting of the Shares from the NYSE." (Emphasis added.) It is that disclosure which tips the balance and impels the Court to find that the Offer, even if benignly motivated, operates in an inequitably coercive manner.

▆▆▆ CMC's directors are fiduciaries for the Preferred stockholders, whose interests they have a duty to safeguard, consistent with the fiduciary duties owed by those directors to CMC's other shareholders and to CMC itself. Those directors have disclosed that they intend to seek to eliminate a valuable attribute of the Preferred stock, namely, its NYSE listing. That listing is the source of that security's market value, and its elimination will adversely affect the interests of nontendering Preferred shareholders. On what basis are the defendants, as fiduciaries, entitled to do that? Defendants do not claim that they are obliged to seek delisting in order to protect a paramount interest of the corporation or an overriding interest of the common stockholders. What they seem to argue is that the criticized disclosure is not coercive because it is not material, because if the criteria for listing are no longer met, the stock will be delisted automatically, irrespective of and without regard to any action of the directors.

That argument has two infirmities. First, it is inconsistent with the Offer to Purchase, which discloses that if the listing criteria are no longer met, the NYSE "would consider" delisting the shares. That disclosure does not say that delisting will be automatic. Second, if the defendants are correct in their argument that delisting will occur automatically as a matter of law, then they need not disclose that CMC "intends to request delisting." Such a disclosure is unnecessary and, therefore,

misleading. The only apparent purpose of such a disclosure would be to induce shareholders to tender by converting a possibility of delisting into a likelihood or certainty. On that basis it must be concluded that the Offer is inequitably coercive.

## IV. IRREPARABLE HARM AND BALANCING OF THE EQUITIES

▆▆▆ Since the plaintiffs have shown a reasonable probability that the defendants have breached a fiduciary duty, the inquiry next becomes whether a reasonable probability of irreparable harm has been established, and, if so, whether such harm outweighs whatever harm that might result from the entry of a preliminary injunction.

The defendants argue that any harm to the shareholders is remediable in damages, but that argument overlooks the gravamen of the injunction claim. Here the principal dispute is not that the offering price is unfair. Rather, at issue is the shareholders' right to make an informed, uncoerced decision. That right is specific, and its enforcement requires a specific, not a substitutional, remedy. As this Court has recognized, to permit a deficient offer to go forward might forever deprive the tendering shareholders of their right to be treated fairly. In that event the harm could not easily be undone, and given the nature of the shareholder interests at stake, damages would not be a meaningful or adequate remedy. Therefore, the threatened harm is irreparable. *Joseph v. Shell Oil Company, supra*, 482 A.2d at 344; *In Re Anderson, Clayton Shareholders Litigation*, Del.Ch., 519 A.2d 669, 676 (1986). An injunction is the remedy most likely to achieve disclosure of the information necessary to achieve an informed decision and to eliminate the Offer's coercive aspects. *See Sealy Mattress Company of New Jersey, Inc. v. Sealy, Inc.*, Del.Ch., 532 A.2d 1324, 1340–41 (July 20, 1987).

▆▆▆ Finally, in balancing the equities, this Court has recognized that the remedy must be tailored to meet the needs of the situation. That is, after all relevant considerations are balanced, the remedy must be as fair as possible to all of the competing

interests. *Joseph v. Shell Oil Company, supra,* 482 A.2d at 344. What are those considerations and interests?

1. This Court has previously found that the disclosure documents relating to the Offer are deficient in certain respects, and that in at least one respect the Offer itself is coercive. Unless cured, those deficiencies will deprive the Offer of its voluntary character.

2. The Offer, even at its current price level, may be perhaps the only foreseeable opportunity for Preferred stockholders to realize an above-market premium for their shares. Some shareholders will want to avail themselves of that opportunity, even though they might wish that the price were higher. Other shareholders, for reasons best known to them, will choose not to tender. Any relief must be crafted to protect, where possible, the rights of both shareholder groups.

3. The logical approach that would best reconcile and protect the differing interests of the Preferred stockholders, while upholding this Court's duty to prevent breaches of fiduciary duty, is to impose preliminary injunctive restraints for only so long as is necessary to cure the disclosure and coercive deficiencies of the Offer. The disclosure deficiencies could promptly be cured by the issuance of an appropriate supplemental disclosure. And defendants' counsel has advised the Court that, if directed to do so, CMC will include in the supplemental disclosure a disclaimer to the effect that it will not take any active steps to cause the Preferred stock to be delisted. In *Joseph v. Shell Oil Company,* this Court determined that the offer before it would be held in abeyance and that supplemental notices, containing the information the Court found should be disclosed, would be sent to shareholders. That procedure continues to be appropriate, and the Court will employ it here as well.

\* \* \*

For the foregoing reasons, the plaintiff's motion for a preliminary injunction is granted. Counsel shall promptly confer and submit a proposed order implementing the rulings made herein.